Marla Fox (State Bar No. 349813)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: mfox@enviroadvocates.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>LIBERTY UTILITIES (CALPECO ELECTRIC) LLC,<br><br>Defendant. | No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33, U.S.C. §§ 1251 et. seq., Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et. seq., and California's Safe Drinking Water and Toxic Enforcement Act of 1986, California Health & Safety Code § 25249.5 et seq.) |

1.    Ecological Rights Foundation ("EcoRights") brings this action against Liberty Utilities (CalPeco) LLC ("CalPeco"), under section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), section 505(a)(1) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1), and California's Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"), California Health & Safety Code § 25249.7(d).

2.    CalPeco is a private electric utility company that provides electrical service to areas on the north and south shores of Lake Tahoe, California, as well as some additional surrounding rural areas. In support of providing electrical service, CalPeco owns and operates transmission lines, distribution lines, and electric utility poles or structures in the field, as well as other assets, including three facilities where CalPeco has stored and maintained utility poles and

1

other wood materials, some of which were treated with pentachlorophenol. CalPeco's three

facilities have in the past, continue to, and will in the future unlawfully discharge and release

toxic pollutants into California waterways. The three facilities are located at: (1) 701 National

Ave., Tahoe Vista, CA 96148 ("701 National" or "the 701 National Facility"); (2) 933 Eloise

Ave., South Lake Tahoe, CA 96150 ("933 Eloise" or "the 933 Eloise Facility"); and (3) 799 Deer

Street, Kings Beach, CA 96143 ("799 Deer" or "the 799 Deer Facility") (each individually,

"Facility" and collectively all three, "Facilities").

3.    Particularly concerning are CalPeco's discharges and releases of chemicals

associated with the new, freshly treated utility poles, used treated utility poles or cross-arms

(collectively, "Poles") and treated wood waste ("TWW")[1] stored at the Facilities. These Poles and

TWW are treated with wood preservative formulations, including the pesticide

pentachlorophenol, chromium, arsenic, copper naphthenate, and/or 4,5-Dichloro-2-n-octyl-3(2H)-

isothiazolone ("DCOI") (collectively "Wood Treatment Mixtures"). Further, pentachlorophenol-

based wood preservatives contain several other extremely toxic chemicals, including

polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans (collectively "Dioxins").

Dioxins are persistent organic pollutants that, at extremely low levels, cause cancer, reproductive

and developmental harm, and interfere with the endocrine and immune systems. Dioxins are the

hazardous chemical components of Agent Orange, the infamous defoliant used by the U.S.

military in Vietnam.

4.    CalPeco's RCRA, CWA, and Proposition 65 violations result from discharges and

releases of the Wood Treatment Mixtures from Poles and TWW that have been treated with

Wood Treatment Mixtures, as well as soil, sediments and wood particles contaminated with

Wood Treatment Mixtures. Pollutants in the form of the Wood Treatment Mixtures and

associated chemicals from the Poles and TWW (collectively "Wood Treatment Mixtures Waste")

are disposed when the Wood Treatment Mixtures used to treat the Poles spill, leak, discharge,

---

[1] TWW means any wood treated with pentachlorophenol, including but not limited to utility poles, utility pole cross arms, portions of utility poles or utility pole crossarms, sawdust, wood chips, or similar debris generated when cutting or otherwise handling pentachlorophenol-treated utility poles or crossarms that CalPeco does not intend to put into service in an electrical grid.

and/or drip from the Poles; when CalPeco discharges polluted storm water and/or snow melt from the Facilities; when TWW is created by CalPeco's use, storage, moving, or other actions or inactions related to the Poles, including, but not limited to, removing Poles from service; and/or when the Wood Treatment Mixtures leave the TWW and become mobilized beyond that matrix and are released into the environment, including in the form of polluted storm water and/or snow melt. Several of the chemicals present in the Wood Treatment Mixtures Waste are listed under Proposition 65 as chemicals that are known to the State of California to cause cancer or reproductive toxicity, including pentachlorophenol (cancer – listed January 1, 1990); pentachlorophenol and by-products of its synthesis (complex mixture) (cancer – Listed October 21, 2016); polychlorinated dibenzo-p-dioxins (cancer – listed October 1, 1992); polychlorinated dibenzofurans (cancer – listed October 1, 1992); 2,3,7,8-Tetrachlorodibenzo-p-dioxin (TCDD) (cancer – listed January 1, 1988 and developmental – listed April 1, 1991); hexachlorodibenzodioxin (cancer – listed April 1, 1988) ("Listed Chemicals"). CalPeco's ongoing improper management of the Wood Treatment Mixtures Waste (including the Listed Chemicals) causes discharges, releases, and contamination of the surface areas, soils, and sediments at the Facilities, and adjoining areas and further discharges and releases when storm water and/or snow melt flushes these pollutants from the Facilities into nearby water bodies, including Lake Tahoe (a source of drinking water under Proposition 65) and tributaries of and wetlands in the vicinity of Lake Tahoe (sources of drinking water under Proposition 65). These nearby water bodies provide important habitat for numerous species and are waters of the United States for CWA purposes. On information and belief, the Wood Treatment Mixtures Waste discharged from the Facilities also infiltrates into and contaminates groundwater. On information and belief, this occurs in areas onsite and/or offsite of the Facilities, including areas adjacent to the Facilities, areas downstream that receive storm water or snow melt runoff from the Facilities, and/or where Wood Treatment Mixtures Waste (including the Listed Chemicals) is otherwise discharged and released from the Facilities by natural or artificial means.

5.      RCRA authorizes citizens to bring civil actions against any person who has contributed or who is contributing to the past or present handling, storage, treatment,

transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment. CalPeco is in violation of RCRA as a result of its past and present handling, storage, treatment, transportation, and/or disposal of solid or hazardous waste at the Facilities in a manner which may present an imminent and substantial endangerment to health or the environment.

6.      The CWA authorizes citizens to bring civil actions against any person who is in violation of an effluent standard or limitation established under the CWA. CalPeco is in violation of the CWA as a result of its discharge of Wood Treatment Mixtures Waste, Dioxins, and other pollutants into waters of the United States without CWA authorization.

7.      Proposition 65 authorizes any person, in the public interest, to bring civil actions against any person who knowingly in the course of doing business discharges or releases a chemical known to the state of California to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water. EcoRights, in the public interest, seeks to address CalPeco's knowing discharges or releases of one or more of the Listed Chemicals in the course of doing business into Lake Tahoe and/or nearby groundwater and/or onto or into land where one or more of the Listed Chemical passes or probably will pass into Lake Tahoe and/or nearby groundwater.

8.      This Court has subject matter jurisdiction over the claims for violations set forth in this Complaint pursuant to: RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B); CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1); and 28 U.S.C. § 1331 (an action for declaratory, injunctive, and other relief arising under the laws of the United States).

9.      EcoRights further requests that the Court exercise supplemental jurisdiction over the Proposition 65 claim under 28 U.S.C. § 1367 because this is a civil action over which this Court has original jurisdiction and EcoRights' Proposition 65 claim is so related to EcoRights' RCRA and CWA claims in the action, which are within this Court's original jurisdiction, that the Proposition 65 claim is part of the same case or controversy under Article III of the United States Constitution as the RCRA and CWA claims. Citizen suit jurisdiction over the Proposition 65 claim is provided by California Health & Safety Code § 25249.7.

10. CalPeco is liable for RCRA, CWA, and Proposition 65 violations occurring at the Facilities. On information and belief, CalPeco owns and operates 701 National, 933 Eloise, and 799 Deer. CalPeco is liable for all violations occurring at the Facilities.

11. EcoRights asserts claims against CalPeco for all violations of RCRA, the CWA, and Proposition 65 at the Facilities.

12. This Complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for CalPeco's violations of RCRA, the CWA, and Proposition 65.

13. On or about May 24, 2024, EcoRights served a citizen suit notice letter ("May 2024 Notice Letter") on CalPeco regarding violations of RCRA and the CWA at the Facilities, and of EcoRights' intention to file suit against CalPeco. EcoRights also sent copies of said May 2024 Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region IX, the U.S. Attorney General, the Executive Director of the State Water Resources Control Board ("State Board"), and the Chair of the Lahontan Regional Water Quality Control Board (Region 6) ("Regional Board"), as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). In addition, EcoRights also sent copies of the May 2024 Notice Letter to the California Department of Resources Recycling and Recovery, as required by RCRA. This completed service on all required entities under RCRA and the CWA.

14. Neither EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations of RCRA and the CWA alleged in the May 2024 Notice Letter. Claims for civil penalties asserted in this action are not barred by any prior administrative penalty under CWA section 309(g), 33 U.S.C. § 1319(g).

15. On or about June 10, 2024, EcoRights served a citizen suit notice letter ("June 2024 Notice Letter") on CalPeco regarding violations of Proposition 65 at the Facilities and of EcoRights' intention to enforce these Proposition 65 violations against CalPeco. EcoRights also sent copies of the June 2024 Notice Letter to the California Attorney General, Placer County District Attorney, and El Dorado County District Attorney as required by Proposition 65, California Health & Safety Code § 25249.7(d)(1).

16.    The State of California, Placer County District Attorney, and El Dorado County District Attorney have not commenced and are not diligently prosecuting an action to redress the violations of Proposition 65 alleged in the June 2024 Notice Letter. California Health & Safety Code § 25249.7(d)(2).

17.    This Court has personal jurisdiction over CalPeco. CalPeco is a California corporation doing business in California, including within the United States District Court for the Eastern District of California.

**VENUE**

18.    Venue in the United States District Court for the Eastern District of California is proper pursuant to RCRA section 7002(a), 42 U.S.C. § 6972(a)(1)(B), because the alleged violations occurred at the three Facilities. 799 Deer Street and 701 National are located in Placer County and 933 Eloise is in El Dorado County. Both Placer County and El Dorado County are in the Eastern District of California, and the alleged endangerment may occur in the Eastern District of California.

19.    Venue in the United States District Court for the Eastern District of California is proper pursuant to CWA section 505(c)(1), 33 U.S.C. § 1365(c)(1), because the sources of the effluent standards or limitations being violated are the three Facilities, which are located within the Eastern District of California.

20.    Should the Court accept EcoRights' request to exercise supplemental jurisdiction over the Proposition 65 claim, venue in the Eastern District of California is proper pursuant to 28 U.S.C. § 1391(b)(1), (2) because a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of properties that are the subject of the action is situated in Kings Beach, California, Tahoe Vista, California, and South Lake Tahoe, California, and in surrounding waters, which are all located in the Eastern District of California.

21.    In addition, venue in the United States District Court for the Eastern District of California is proper because CalPeco maintains offices located within the Eastern District of California at the 701 National and 933 Eloise Facilities.

**THE PARTIES**

22.     EcoRights is a non-profit public benefit corporation with an office in Blocksburg, California and members throughout California, including in and/or around Kings Beach, Tahoe Vista, and South Lake Tahoe, California. Among other work it does, EcoRights focuses on protecting surface waters and groundwater from pollution and degradation. EcoRights represents citizens who are striving to protect soil and waterways from pollution and secure the multitude of public and private benefits that follow from clean soil and from pure water: reduced incidences of cancer and birth defects; safe drinking water; abundant and diverse wildlife populations; healthy recreational opportunities; food uncontaminated by toxic chemicals; economic prosperity from commercial, sport, and subsistence fishing; and other recreational, spiritual, and commercial activities that depend on clean soil and pure water. In particular, EcoRights has worked for decades to prevent Dioxins pollution.

23.     EcoRights' members, employees, and volunteers have been injured by CalPeco's actions. EcoRights' members, employees, and volunteers live and/or recreate in proximity to the Facilities at which CalPeco has released, disposed, and discharged toxic chemicals. EcoRights' members, employees, and volunteers use and enjoy the waters, wildlife, and other natural resources that are adversely impacted and endangered by CalPeco's discharges of contaminated storm water or snow melt runoff from the Facilities, including into one or more sources of drinking water or onto or into land where such chemical passes or probably will pass into one or more sources of drinking water, and its past and present handling, storage, treatment, transportation, and/or disposal of solid or hazardous waste at the Facilities. CalPeco's actions cause these individuals to suffer injury in fact to these interests. The harmed resources include, but are not limited to, Lake Tahoe; wetlands, streams, and other waters near Lake Tahoe; nearby groundwater; and the valuable riparian, wetland, beach, and other areas within and adjacent to those waters and lands. The harmed resources also include all waters and natural resources proximate thereto (such as adjacent or nearby wetlands, hiking trails, beaches, preserves, parks, and the like), and those plant and animal species that occupy, use, migrate through, reside, breed, and/or forage in and/or around these waters and/or natural resources. Aquatic species harmed include rainbow trout, brook trout, brown trout, lake trout, Kokanee salmon, crayfish, mysis

7

shrimp, and other fish and aquatic species. Wildlife harmed include various species of terrestrial wildlife such as bear, beaver, coyote, squirrel, mule deer, raccoon, marmot, and other wildlife, and plant species. Migratory and non-migratory birds harmed include osprey, bald eagle, blue jay, other jay species, Western tanager, mallard duck and other species of duck, Canadian geese, other species of geese, various species of woodpeckers, various species of falcons, Mountain Chickadee, and other chickadee species. The species harmed also include various species listed under the Endangered Species Act ("ESA") and their designated critical habitats including the Federally endangered South Sierra Distinct Population Segment ("DPS") of foothill yellow-legged frog (*Rana boylii*), and the Federally threatened Lahontan cutthroat trout (*Oncorhynchus clarki henshawi*). This also includes harm to other animals higher up the food chain that feed on contaminated benthic organisms and other animals and animals that feed on those animals, including, but not limited to humans who eat contaminated fish or shellfish. Humans, including EcoRights' members, may also be harmed when exposed to contaminated water or soils during water contact activities and when they come into contact with contaminated water, snow melt, or soils during their daily activities or otherwise. EcoRights' members', employees', and volunteers' use and enjoyment of these waters, lands, species, and other natural resources is injured by, and is at an increased risk and threat of injury by, the ongoing violations of RCRA, the CWA, and Proposition 65 set forth herein.

24.     CalPeco is a private electrical utility corporation that provides electrical service to areas on the north and south shores of Lake Tahoe, California, as well as some additional surrounding rural areas. CalPeco owns, operates, and/or maintains the three Facilities and carries out, or previously carried out, activities at the Facilities that caused and continues to cause both onsite and offsite contamination of the environment.

## STATUTORY BACKGROUND

**I.     Resource Conservation and Recovery Act.**

25.     RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), prohibits any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, from contributing to the past or present handling, storage, treatment,

1   transportation, or disposal of any solid or hazardous waste which may present an imminent and

2   substantial endangerment to health or the environment.

3   **II.      Clean Water Act.**

4        26.      CWA § 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into

5   waters of the United States unless the discharge is in compliance with various enumerated CWA

6   sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in

7   violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit

8   issued pursuant to CWA section 402, 33 U.S.C. § 1342.

9        27.      The 1987 amendments to the CWA (enacted via the Water Quality Act of 1987)

10  make clear that an NPDES permit is required for discharges associated with industrial activities

11  or for discharges that a State has determined contribute to a violation of a water quality standard

12  or constitute a significant contributor of pollutants to waters of the United States. CWA §

13  402(p)(1)-(2), 33 U.S.C. § 1342(p)(1)-(2).

14       28.      EPA defines the term storm water discharge associated with industrial activity, in

15  part, to mean "the discharge from any conveyance that is used for collecting and conveying storm

16  water and that is directly related to the manufacturing, processing or raw materials storage areas

17  at an industrial plant." 40 C.F.R. § 122.26(b)(14).

18       29.      EPA's regulations list several categories of industrial facilities that "are considered

19  to be engaging in 'industrial activity.'" *Id*. These categories include, *inter alia*, "(iii) Facilities

20  classified as Standard Industrial Classifications 10 through 14" (including Standard Industrial

21  Classification code ("SIC Code") 1442 (construction sand and gravel, which includes "washing,

22  screening, or otherwise preparing sand and gravel for construction uses."), "(v) "Landfills, land

23  application sites, and open dumps that receive or have received any industrial wastes (waste that

24  is received from any of the facilities described under this subsection) including those that are

25  subject to regulation under subtitle D of RCRA," "(vi) Facilities involved in the recycling of

26  materials" and classified as SIC Code 5093, and "(viii) Transportation facilities classified as

27  Standard Industrial Classifications 40, 41, 42 (except 4221–25), 43, 44, 45, and 5171 which have

28  vehicle maintenance shops [or] equipment cleaning operations . . . .".

30.    In addition to defining "industrial activity" with reference to specific SIC Codes, the regulations also contain a narrative description of activities that constitute "industrial activity," including:

> industrial plant yards; . . . material handling sites; . . . sites used for the storage and maintenance of material handling equipment; . . . shipping and receiving areas; . . . storage areas (including tank farms) for raw materials, and intermediate and final products; and areas where industrial activity has taken place in the past and significant materials remain and are exposed to storm water.

*Id*. § 122.26(b)(14).

31.    EPA regulations require the submission of an application for an NPDES permit by any person who discharges pollutants and does not have an effective permit to discharge pollutants to waters of the United States. 40 C.F.R. § 122.21(a). In addition, CWA section 402(p)(4)(A) imposes a deadline of February 4, 1990 for industrial dischargers of storm water to apply for NPDES permits. *See* 33 U.S.C. § 1342(p)(4)(A) ("[A]pplications for permits for [industrial] discharges shall be filed no later than 3 years after the date of enactment" of CWA section 402(p)).

32.    CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1), 1362(5).

33.    CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $64,618 per day per violation for all CWA violations, pursuant to CWA section 309(d), 33 U.S.C. §1319(d), and the EPA Adjustment of Civil Monetary Penalties for Inflation Regulation, 40 C.F.R. § 19.4 (Exhibits 1 and 2 thereto).

## III.    The General Industrial Storm Water Permit.

34.    CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved permit program for discharges. In California, the State Board has approval from EPA to administer an NPDES permit program for the State. The State Board issues individual and

1    general NPDES permits regulating water pollutant discharges from various categories of

2    dischargers located in California.

3         35.     The State Board adopted the "National Pollution Discharge Elimination System

4    (NPDES) General Permit for Storm Water Discharges Associated With Industrial Activities,"

5    Order NPDES No. CAS000001, in Order No. 2014-0057-DWQ, effective July 1, 2015, amended

6    in 2018 ("2015 Permit"). The 2015 Permit replaced the predecessor version of the California

7    industrial storm water general permit, NPDES General Permit No. CAS000001, adopted by the

8    State Board in Order No. 97-03-DWQ ("1997 Permit"). The 2015 Permit and 1997 Permit are

9    collectively referred to herein as the "General Permit."[2]

10         36.     The CWA and its implementing regulations require any person who discharges or

11    proposes to discharge pollutants into waters of the United States in California to submit an

12    NPDES permit application to the State Board. 40 C.F.R. §§ 122.21(a), 122.26(a)(ii); 33 U.S.C. §

13    1342(p)(2)(b). The General Permit requires existing facilities subject to its terms, such as the

14    Facilities, to file a Notice of Intent to Comply ("NOI") for coverage under the General Permit and

15    to thereafter comply with its procedural and substantive requirements. Any violation of the

16    General Permit or its terms (all of which constitute "effluent limitations" under 33 U.S.C. §

17    1365(f)) is a violation of the CWA actionable in a citizen suit brought pursuant to CWA section

18    505(a)(1), 33 U.S.C. § 1365(a)(1).

19         37.     The General Permit defines nine categories of activities considered to be

20    "industrial activity." These include: (a) recycling facilities such as scrap metal yards under SIC

21    Code 5093; (b) transportation facilities, including terminals that provide maintenance and service

22    for motor vehicles under SIC Code 4231; (c) facilities involved in handling sand and gravel for

23    construction uses under SIC Code 1442; and (d) facilities that receive or have received industrial

24    waste from any facility within any other covered category of activity, including facilities subject

25    to regulation under RCRA Subtitle D and facilities that have accepted wastes from construction

26

27

28    [2] Both versions of NPDES Permit No. CAS000001, the 1997 Permit and 2015 Permit, have
       essentially the same terms and conditions.

activities (including any clearing, grading, or excavation that results in disturbance). *See* General

Permit, Attachment A.

38.     The Fact Sheet accompanying the General Permit ("Fact Sheet") discusses how to

classify a facility when multiple different activities are occurring there. It relies on the 1987 SIC

Manual ("SIC Manual"), which accompanied the publication of the SIC Codes, and says:

> This General Permit provides regulatory coverage for all facilities with industrial activities described in Attachment A where the covered industrial activity is the Discharger's primary industrial activity. *In some instances, a Discharger may have more than one primary industrial activity occurring at a facility.*

> The 1987 SIC manual uses the term "establishment" to determine the primary economic activity of a facility. The manual instructs that *where distinct and separate economic activities are performed at a single location, each activity should be treated as a separate establishment (and, therefore, separate primary activity).* For example, the United States Navy (primary SIC code 9711) may conduct industrial activities subject to permitting under this General Permit, such as landfill operations (SIC code 4953), ship and boat building and repair (SIC code 3731), and flying field operations (SIC code 4581).

Fact Sheet at 9 (emphasis added). This language makes clear that each "distinct and separate

economic activity" within a facility is treated as a separate "establishment" (and therefore, a

separate "primary activity"). The SIC Manual also instructs that:

> Where distinct and separate economic activities are performed at a single physical location (such as construction activities operated out of the same physical location as a lumber yard), each activity should be treated as a separate establishment where: (1) no one industry description in the classification includes such combined activities; (2) the employment in each such economic activity is significant; and (3) separate reports can be prepared on the number of employees, their wages and salaries, sales or receipts, and other types of establishment data.

SIC Manual at 12. Under the SIC Manual, SIC Codes are assigned to each establishment based on

the primary activity of that establishment. *Id*. at 11. Therefore, read together, the Fact Sheet and

the SIC Manual make clear that a given facility can have multiple SIC Codes, each of which

applies to each distinct and separate economic activity at the facility (*i.e.*, each "establishment").

This is demonstrated by the example of a Navy base provided in the Fact Sheet. Although the

12

activity of the Navy as a whole is classified as within SIC Code 9711 ("Establishments of the armed forces, including the National Guard, primarily engaged in national security and related activities."), separate portions of a Naval base may be separately classified, if the Navy conducts "discrete and separate economic activity" in such areas (*e.g.*, landfill operations, ship building, and airfield operations).

39.     In addition to the categories of "industrial activity" defined with reference to specific SIC Codes, the General Permit also includes a general description of activities that constitute "industrial activity," including the following:

> industrial plant yards; . . . material handling sites; . . . sites used for the storage and maintenance of material handling equipment; . . . shipping and receiving areas; . . . storage areas (including tank farms) for raw materials, and intermediate and finished products; and areas where industrial activity has taken place in the past and significant materials remain.

*See* General Permit, Attachment C (defining "Storm Water Discharge Associated With Industrial Activity").

40.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

41.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in the Statewide Water Quality Control Plan or the relevant Regional Board's Basin Plan.[3]

---

[3] The Basin Plan for each watershed region is published by each applicable California Regional

42.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing an NOI.

43.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, I(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

**IV.    Proposition 65**

44.     Proposition 65, California Health & Safety Code § 25249.5, states "[n]o person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water…."

45.     To qualify as a "person in the course of doing business," a business need only employ more than 10 individuals. California Health & Safety Code § 25249.11.

46.     Whether a chemical is "known to the state to cause cancer or reproductive toxicity" is determined by reference to the "Proposition 65 List" ("State List"). *See, e.g.,* California Health & Safety Code § 25249.8; https://oehha.ca.gov/proposition-65/proposition-65-list. The State List includes all the Listed Chemicals.

47.     Knowing discharge of any chemicals on the State List is a violation unless a

Water Quality Control Board and can be found at each Regional Board's website, available at: https://www.waterboards.ca.gov/about_us/contact_us/rwqcbs_directory.html.

chemical has not yet been listed for at least 20 months or where the discharge or release *both* "will not cause any significant amount of the discharged or released chemical to enter any source of drinking water" *and* "is in conformity with all other laws and with every applicable regulation, permit, requirement, and order." California Health & Safety Code § 25249.9. Showing these criteria are met is the Proposition 65 defendants' burden. *Id.*

48.     A "source of drinking water" means either a present source of drinking water or water that is identified or designated in a water quality control plan adopted by a California Regional Water Quality Control Board as being suitable for domestic or municipal uses. California Health & Safety Code § 25249.11(d). Moreover, "water" is defined to include both surface and groundwater. 27 California Code of Regulations § 25102(w).

**STATEMENT OF FACTS**

I.     **CalPeco's Handling, Storage, Treatment, Transportation, and Disposal of Solid or Hazardous Waste May Present an Imminent and Substantial Endangerment to Health or the Environment in Violation of RCRA.**

    A.     **The Toxic Effects of Exposure to Dioxins in Humans and Wildlife.**

49.     The Wood Treatment Mixtures include pentachlorophenol-based wood treatment mixtures that are used to treat the Poles and TWW stored at the Facilities. Pentachlorophenol is a chemical known to cause cancer in the State of California.

50.     Currently existing published, peer reviewed literature shows that "Dioxins," which are a class of highly persistent chemicals made up of numerous polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans congeners, several of which have half-lives measured in decades, are found in virtually all samples of technical grade pentachlorophenol mixtures.

51.     Hence, any handling, storage, treatment, transportation, or disposal of pentachlorophenol wastes from the Poles will also include the handling, storage, treatment, transportation, or disposal of wastes containing Dioxins and other contaminants.

52.     Several Dioxins congeners have been shown to cause toxic responses similar to those caused by 2,3,7,8-TCDD, which is considered the most potent of the congeners. Dioxins are known to the State of California, the federal government, and the World Health Organization

15

("WHO") to cause cancer and developmental and reproductive harm. Dioxins are Endocrine Disrupting Chemicals ("EDCs"). EDCs are a global problem for environmental and human health. They are defined as "an exogenous chemical, or mixture of chemicals, that can interfere with any aspect of hormone action." Most EDCs like Dioxins are lipophilic and bioaccumulate in the adipose tissue, thus they have a very long half-life in the body. Timing of exposure is of importance. Developing fetuses and neonates are the most vulnerable to endocrine disruption. EDCs may interfere with synthesis, action and metabolism of sex steroid hormones that in turn cause developmental and fertility problems, infertility, and hormone-sensitive cancers in women and men.

53.     In assessing cancer hazard from Dioxins, it is safe to rely on a linear, no-threshold model for genotoxic chemicals. A linear no-threshold model for cancer risk assessment is a standard toxicological method used to assess cancer risk. For example, under the California Code of Regulations, the California Office of Environmental Health Hazard Assessment ("OEHHA") assumes that "the absence of a carcinogenic threshold dose shall be assumed and no-threshold models shall be utilized" when assessing cancer risk from a particular carcinogen. OEHHA has determined that, in the absence of convincing data that shows a threshold below which there is no risk of cancer, it is standard toxicological practice to assume no threshold exists for cancer hazard. Under the linear no-threshold model, exposure to extremely low levels of a carcinogen increases the quantitative risk of contracting cancer, even if that risk is very small. Based on currently existing published, peer reviewed studies, there is no significant evidence to show that there is a threshold below which there is no cancer risk from exposure to certain Dioxins. Conversely, Data exists that demonstrates biological effects of Dioxins in the nanogram and picogram range, *i.e.*, at levels substantially below those previously found to be toxic for these chemicals. As a result, even very small doses of Dioxins should be assumed to increase cancer risk.

54.     Dioxins also cause dermal toxicity, immunotoxicity, birth defects, and other adverse effects on reproduction, development, and endocrine function.

55.     The immune system is a particularly vulnerable target for the toxicity of Dioxin-

16

like compounds, including Dioxins. The ability of an animal to resist and/or control viral, bacterial, parasitic, and neoplastic diseases is determined by both nonspecific and specific immunological functions, which can be adversely affected by very low levels of Dioxin-like compounds in body tissues.

56.     Individual species vary in their sensitivity to any particular Dioxin's effect. The evidence available to date indicates that humans most likely fall in the middle of the range of sensitivity for individual effects among animals. In Dioxins-exposed men, subtle changes in biochemistry and physiology, such as enzyme induction, altered levels of circulating reproductive hormones, or reduced glucose tolerance, have been detected in some available studies. These findings, coupled with knowledge derived from animal experiments, suggest the potential for adverse impacts on human metabolism and developmental and/or reproductive biology and, perhaps other effects in the range of current human exposures at nanograms per kilogram (parts per trillion) levels. As body burdens of Dioxin-like compounds increase, the probability and the severity, as well as the spectrum of human noncancer effects increase. Hence, any additional increase in body burden of Dioxin-like compounds increases the risk of harmful toxicological effects.

57.     Due to their hydrophobic nature and resistance toward metabolism, Dioxins, when ingested, have been found to accumulate in fatty tissues of animals and humans. Due to the Dioxins' persistence in the fatty tissues of the host organism, contaminants in the host will ultimately be passed on to upper trophic level species through bioaccumulation and biomagnification. What this means is that if, for example, a fish eats many microscopic organisms, each of which have ingested a low level of Dioxins, the Dioxins from each microscopic organism will remain in the fatty tissues and fluids of the fish, resulting in a much greater concentration of these chemicals in the fish. Similarly, any fish that feeds on fish that have eaten microscopic organisms that have ingested Dioxins will have even greater concentrations of these chemicals in its fatty tissues and fluids. This same bio-magnifying process applies up any food chain, resulting in especially high concentrations of these chemicals in the fatty tissues and fluids of animals at the top of a food chain. This bio-magnified amount of toxins concentrated in

fatty tissues and fluids is commonly referred to as the "body burden" of these chemicals. This places high trophic level predators like game fish, marine mammals, eagles, and humans that feed on the prey at the greatest risk. As such, compounds like and including Dioxins can be found at high levels in upper trophic level organisms even where they are found at only sub-detectable levels in environmental media. Dioxins accumulate in human fatty tissue (with a half-life of 7-12 years). They are metabolized (mainly by the liver) and eliminated much more slowly than in other animals. Dioxins are excreted mainly through feces, and through breast milk. Children, nursing infants, some workers, people who eat fish as a main staple of their diet, and people who live near Dioxins-release-sites are potential high-exposure groups. Children and fetuses are the most susceptible to the health effects of Dioxins exposure.

58.    In summary, exposure to Dioxins can increase the body burden of these chemicals, particularly in species like humans and other high trophic level species that are at the top of long food chains. Any increase in body burdens of these chemicals increases the risk of several toxic endpoints including cancer, developmental toxicity, reproductive toxicity, and immunotoxicity. Because of the present high body burdens of these compounds in humans and wildlife, any increment in dosage will generate an increased risk of toxicity. Because there is such a wide range of species of animals for which exposure to Dioxins-like compounds has been shown to disrupt prenatal development and to cause embryo/fetal mortality, exposure to Dioxins increases the risk of embryo/fetal mortality in fish, birds, and mammals. Exposure to Dioxins can increase the risk that humans and wildlife, including fish, birds, and mammals, will suffer decreased immune system function, and thus bear an increased risk that they will contract, or succumb to, viral, bacterial, parasitic, and neoplastic infections and diseases. As body burdens of these chemicals increase, so does the risk that all of the above-mentioned species will suffer the above referenced toxic endpoints.

**B.    CalPeco Has Handled, Stored, Treated, Transported, and Disposed of the Wood Treatment Mixtures Waste at the Facilities.**

18

59.   Solid or hazardous waste from the Poles, including TWW, (collectively "Wood Treatment Mixtures Waste") is disposed of when the Wood Treatment Mixtures used to treat the Poles spill, leak, discharge, and/or drip from the Poles and/or TWW (such drippage is itself solid or hazardous waste); when TWW is created by CalPeco's use, storage, moving, or other actions or inactions related to the Poles and/or TWW (this TWW is solid or hazardous waste); and/or when the Wood Treatment Mixtures leave the Poles and/or TWW and become mobilized beyond that matrix and are released into the environment, including, but not limited to, in polluted storm water and snow melt, which such polluted storm water and snow melt is itself a solid or hazardous waste, and in soil both on and offsite of the Facilities, which is also itself solid or hazardous waste. This solid or hazardous waste contaminates the surface areas, storm drains, and/or water bodies adjoining or near the Poles and TWW, as well as those downstream. In addition, the Wood Treatment Mixtures Waste discharged by the Poles and TWW infiltrates into and contaminates soils and groundwater. This occurs in areas offsite of the Facilities, including areas adjacent to the Facilities as well as areas downstream that receive storm water or snow melt runoff from the Facilities and/or where Wood Treatment Mixtures Waste is otherwise discharged from the Facilities by natural or artificial means.

60.   EcoRights' investigations have revealed that Dioxins and, on information and belief, one or more of the other pollutants listed above are picked up by storm water or snow melt on the Facilities and enter the driveways leading into and out of the Facilities, culverts, storm water collection vaults, ditches, gutters, and other surface channels and channelized areas at and adjacent to the Facilities, the drop inlets and storm drain systems used to convey storm water and snow melt away from the Facilities and the Storm Sewer System, and/or sheet flow flowing off of other portions of the Facilities. From there, these pollutants are transported directly to receiving waters over the surface of the land and/or through the Storm Sewer System and/or through other conveyances and/or some combination of these into receiving waters, including but not limited to, into Lake Tahoe and the wetlands, streams, and other waters adjacent to Lake Tahoe, all of which are waters of the United States for CWA purposes. Lake Tahoe and the surrounding riparian areas, wetlands, streams, and other waters adjacent to Lake Tahoe as well as the groundwater that

19

receives the pollutants are locations of imminent and substantial endangerment to health or the environment for RCRA purposes.

61.    EcoRights has tracked some of the storm water or snow melt discharges from the Facilities and has sampled soil in the path of that storm water or snow melt on the Facilities' grounds. These investigations have shown dangerous accumulations of Dioxins in the soil.

62.    In addition, pollutants are also discharged from the Facilities by tracking from vehicles and/or foot traffic and/or by wind, leaf blower, sweeping, power washing, and/or other natural or artificial processes that are designed to or do move material from one area to another. Once grit or other material contaminated with Dioxins, pentachlorophenol, and/or other pollutants, which are solid and/or hazardous wastes, is transported into public streets or other areas outside the Facilities, storm water and snow melt picks up this contaminated material and transports it into receiving waters and/or the Storm Sewer System and other conveyances that lead to receiving waters including, but not limited to, the waters listed above and the valuable wetland and other waters within and adjacent to those waters (all of which are waters of the United States for CWA purposes and all of which are locations of imminent and substantial endangerment to health or the environment for RCRA purposes), and the adjacent and nearby shore and other areas that are locations where dangerous accumulations of these toxic chemicals present an imminent and substantial endangerment to health or the environment for RCRA purposes.

63.    The Facilities' storm water and snow melt is contaminated with the toxic Wood Treatment Mixtures Waste from the Poles and TWW and this storm water and snow melt is itself solid or hazardous waste. Humans, their pets, and wildlife come into direct and indirect contact with this contaminated storm water and snow melt, and the contaminated storm water and snow melt is also tracked into nearby homes and businesses where humans and pets are further exposed to the contamination from the Facilities. In addition, the toxic Wood Treatment Mixtures Waste from the Poles and TWW travels in storm water and snow melt to unpaved areas downstream of the Facilities where it contaminates surface soils and infiltrates into the ground and groundwater. On information and belief, this occurs in areas including, but not limited to, Lake Tahoe, its

tributaries including Griff Creek, the Tahoe Keys, Pope Marsh, and/or surrounding wetland and/or riparian areas in and/or near the Facilities. When these groundwaters subsequently connect with and discharge to surface waters, those surface waters are also contaminated with the toxic Wood Treatment Mixtures Waste discharged from the Facilities. In addition, this toxic Wood Treatment Mixtures Waste contaminates the Facilities themselves. In particular, the toxic Wood Treatment Mixtures Waste contaminates soil and standing water on the Facilities, such as puddles, where humans as well as birds, squirrels, gophers, insects, arachnids, centipedes, millipedes, snails, and/or other wildlife make contact with, and are harmed by, the contaminants. This contamination can further escape the Facilities when surface soil and other solids contaminated by CalPeco's Wood Treatment Mixtures Waste, which such soils and other solids are themselves all solid or hazardous waste, are tracked off of the Facilities by vehicles, foot traffic, and/or in storm water and/or by wind, leaf blower, sweeping, power washing, and/or other natural or artificial processes that are designed to and/or do move material from one area to another. When these contaminated materials leave the Facilities, they enter the surrounding neighborhoods, businesses, natural areas, waters, and public rights of way and expose people, pets, and wildlife to CalPeco's Wood Treatment Mixtures Waste.

64.     Additional sources of solid or hazardous wastes that are composed of the Wood Treatment Mixtures Waste or are heavily contaminated with the Wood Treatment Mixtures Waste, and/or their associated constituent contaminants, being disposed of, released, or further distributed to the environment from the Poles and TWW are as follows: (1) when CalPeco makes contact with the Poles, wood chips are dislodged from the Poles and fall to the ground, becoming TWW, and are then spread around the Facilities and/or tracked off of the Facilities by vehicles, foot traffic, and/or in storm water and/or by wind, leaf blower, sweeping, power washing, and/or other natural or artificial processes that are designed to and/or do move material from one area to another; (2) when CalPeco prepares the Poles for field placement and drills holes in, or saws into, the Poles, CalPeco generates sawdust that is released onto the Facilities and/or tracked off of the Facilities by vehicles, foot traffic, and/or in storm water and/or by wind, leaf blower, sweeping, power washing, and/or other natural or artificial processes that are designed to and/or do move

1    material from one area to another; and (3) when CalPeco prepares the Poles for disposal by

2    cutting and/or drilling into the Poles, CalPeco generates TWW in the form of sawdust, which

3    sawdust is released onto the Facilities and/or tracked off of the Facilities by vehicles, foot traffic,

4    and/or in storm water and/or by wind, leaf blower, sweeping, power washing, and/or other natural

5    or artificial processes that are designed to and/or do move material from one area to another.

6         65.    In these ways, CalPeco has contributed to, or is contributing to, the past or present

7    handling, storage, treatment, transportation, or disposal of solid or hazardous waste.

8         **C.    CalPeco's Handling, Storage, Treatment, Transportation, and Disposal of the**

9              **Wood Treatment Mixtures Waste May Present an Imminent and Substantial**

10             **Endangerment to Health or the Environment.**

11        66.    As discussed above, Dioxins are part of a class of compounds that the scientific

12   community identifies as "Dioxin-like" compounds. These chemicals are called Dioxin-like

13   compounds because they tend to affect organisms in the same way as does the most potent toxic

14   chemical of this class, 2,3,7,8 tetrachlorodibenzo-p-dioxin ("2,3,7,8-TCDD"), but have different

15   potencies for causing toxicological effects.

16        67.    To facilitate both ecological and human risk assessment the WHO assembled a

17   panel of experts to develop the above-mentioned TEFs that are applied to the specific Dioxins

18   congeners to provide a TEQ to 2,3,7,8-TCDD, which, as discussed above, is the relevant value for

19   assessing the Dioxins toxicity of a sampled material.

20        68.    It is the generally accepted practice within the scientific community to assess the

21   toxicological effects of Dioxins based on their relative potencies compared to the potency of

22   2,3,7,8-TCDD (*i.e.*, by assessing the TEQ).

23        69.    Because the above referenced ESLs are set at levels deemed necessary to protect

24   human health or the environment, CalPeco's discharge of Dioxins at levels that exceed the ESLs

25   necessarily constitutes an imminent and substantial endangerment to human health or the

26   environment in violation of RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B).

27        70.    The affected environmental resources include, but are not limited to, Lake Tahoe

28   and its tributaries including Griff Creek; Tahoe Keys; Pope Marsh; nearby groundwater; and the

valuable riparian, wetland, shore and other areas within and adjacent to those waters and lands, including those species that occupy, use, migrate through, reside, breed, and/or forage in and/or around these waters and/or natural resources. This includes, but is not limited to, all waters and natural resources proximate thereto (such as adjacent or nearby wetlands, hiking trails, beaches, preserves, parks, and the like), and including those species of plants and animals that occupy, use, migrate through, reside, breed, and/or forage in and around these waters and natural resources. The aquatic species harmed by CalPeco's actions include rainbow trout, brook trout, brown trout, lake trout, Kokanee salmon, crayfish, mysis shrimp, and other fish and aquatic species. Wildlife harmed include various species of terrestrial wildlife such as bear, beaver, coyote, squirrel, mule deer, raccoon, marmot, and other wildlife, and plant species. Migratory and non-migratory birds harmed include osprey, bald eagle, blue jay, other jay species, Western tanager, mallard duck and other species of duck, Canadian geese, other species of geese, various species of woodpeckers, various species of falcons, Mountain Chickadee, and other chickadee species. The species harmed also include various species listed under the ESA and their designated critical habitats including the Federally endangered South Sierra DPS of foothill yellow-legged frog (*Rana boylii*), and the Federally threatened Lahontan cutthroat trout (*Oncorhynchus clarki henshawi*). This also includes harm to other animals higher up the food chain that feed on contaminated benthic organisms and animals that feed on those animals, including, but not limited to humans who eat contaminated fish or shellfish. Humans may also be harmed when exposed to contaminated water or soil during water contact activities and when they come into contact with contaminated water and soil during their daily activities or otherwise.

71.    Because the toxic chemicals in the Wood Treatment Mixtures used to treat CalPeco's Poles, and present in the Wood Treatment Mixtures Waste at and discharged from CalPeco's Facilities, are so long lived and because they bio-accumulate and bio magnify in living organisms, many species, including fish, birds, amphibians, reptiles, and mammals, including humans, that participate in the food chain downstream of CalPeco's Poles and TWW bear an increased risk of suffering the toxic endpoints discussed above.

72.     EcoRights alleges that every discharge of storm water or snow melt from the Facilities has contained Wood Treatment Mixtures Waste, including Dioxins and other pollutants from the Wood Treatment Mixtures, and may present and will in the future continue to present an imminent and substantial endangerment to health or the environment. EcoRights further alleges that CalPeco's handling, storage, treatment, transportation, and disposal of storm water or snow melt at the Facilities may have and will continue to present an imminent and substantial endangerment to health or the environment each day that the Wood Treatment Mixtures Waste, including Dioxins, are tracked off of the Facilities by vehicles, foot traffic, and/or in storm water or snow melt and/or by wind, leaf blower, sweeping, power washing, and/or other natural or artificial processes that are designed to and/or do move material from one area to another.

73.     EcoRights further alleges that CalPeco's handling, storage, treatment, transportation, or disposal of storm water or snow melt at the Facilities may present and will continue to present an imminent and substantial endangerment to health or the environment each day that the Wood Treatment Mixtures Waste, including Dioxins, is present on the surfaces of the Facilities, including the grounds and soils present at the Facilities, where humansand wildlife that are present at the Facilities at any time may come into contact with the Wood Treatment Mixtures Waste.

74.     EcoRights further alleges that CalPeco's handling, storage, treatment, transportation, or disposal of the Wood Treatment Mixtures Waste may present and will continue to present an imminent and substantial endangerment to health or the environment each day that the Wood Treatment Mixtures Waste, including Dioxins and/or other pollutants from the Wood Treatment Mixturesis present on and/or in the surfaces, soils, waters, and/or other materials that have been contaminated by the Wood Treatment Mixtures Waste that has migrated from, and/or that will migrate from, the Facilities, including the soils present in areas adjacent to or near the Facilities and other areas where pollution from the Facilities spreads by natural and/or artificial means, where humans, pets, and wildlife that are present in those areas may come into contact with the Wood Treatment Mixtures Waste.

75.    EcoRights further alleges that CalPeco's handling, storage, treatment, transportation, or disposal of the Wood Treatment Mixtures Waste may present and will continue to present an imminent and substantial endangerment to health or the environment each day that the Wood Treatment Mixtures Waste, including Dioxins, enters and/or accumulates in soils, surface waters, and groundwater at the Facilities and elsewhere.

76.    CalPeco has thus been violating RCRA continuously for at least the past five years preceding the May 2024 Notice Letter and June 2024 Notice Letter and will continue to violate RCRA on every day into the future until CalPeco ceases discharging storm water and snow melt and otherwise discharging the Wood Treatment Mixtures Waste, including Dioxins and/or other pollutants from the Wood Treatment Mixtures from the Facilities and removes the Wood Treatment Mixtures Waste, including Dioxins, from the Facilities and the environment that CalPeco has already disposed of.

**II.    CalPeco's Discharges of Pollutants From the Facilities Are Subject to, and in Violation of, the CWA.**

**A.    CalPeco Conducts Distinct and Separate Economic Activities at the Facilities Falling Within the Definition of "Industrial Activity."**

77.    CalPeco is a private electrical utility corporation that provides electrical services to areas on the north and south shores of Lake Tahoe, California, as well as some additional surrounding rural areas. CalPeco distributes electricity via an electrical grid, the wires for which are often suspended by utility poles that are treated with the Wood Treatment Mixtures. To maintain its electrical distribution system, CalPeco operates and maintains the Facilities.

78.    On information and belief, CalPeco conducts distinct and separate economic activities at each of the three Facilities that fall within one or more of the categories of "industrial activity" set forth above.

79.    As noted, the General Permit and EPA's regulations cover recycling activities under SIC Code 5093, which refers to "Establishments primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials." CalPeco stores Poles and TWW at the Facilities. On information and belief, CalPeco conducts metals recycling activities at

the Facilities in the form of breaking down used Poles and TWW, and separating metal parts (such as cross-arms, insulators, and transformers) and other scrap metal into bins. CalPeco thus conducts scrap metal recycling activities, including recycling that it does with contractors that assist in that recycling, within SIC Code 5093. These metals are stored in large dumpsters at the Facilities. These dumpsters are uncovered and located in outdoor areas where they are exposed to storm water and snow melt.

80.    No single industry description in the classification includes both these metals recycling activities and activities involved with transmission and distribution of electric energy for sale. CalPeco's metal recycling activities are the same types of activities that a metal scrap recycling facility would engage in if it were a standalone metal scrap processing facility. This activity constitutes a "distinct and separate economic activity" at the Facilities (and therefore, a separate establishment), with the "primary activity" of recycling under SIC Code 5093. Under the General Permit and its Fact Sheet, this triggers the need for General Permit coverage.

81.    On information and belief, CalPeco conducts vehicle maintenance activities within SIC Code 4231 (covering "terminals which provide maintenance and service for motor vehicles") at the Facilities. The Facilities house a fleet of utility vehicles consisting of a variety of light, medium, and heavy duty cars, trucks, and other transportation and service equipment. On information and belief, CalPeco conducts activities at the Facilities including performing routine vehicle maintenance and vehicle repair. These vehicle maintenance activities are the same type of activities that would be conducted by a standalone truck terminal facility.

82.    No single industry description in the classification includes both these vehicle maintenance activities and activities involved with transmission and distribution of electric energy for sale. On information and belief, CalPeco employs numerous employees and contractors to work on vehicle maintenance activities at the Facilities. As such, this activity constitutes a "distinct and separate economic activity" at the Facilities (and therefore, a separate establishment), with the "primary activity" of vehicle maintenance under SIC Code 4231. Under the General Permit and its Fact Sheet, this triggers the need for General Permit coverage.

83.    On information and belief, CalPeco receives at the Facilities certain wastes from

1    activities including "clearing, grading, or excavation" from construction activities related to

2    placement and removal of utility poles, maintenance of electrical grid components, field repair

3    and decommissioning of facilities and equipment, and other activities and wastes from facilities

4    regulated under RCRA Subtitle D. Given the nature of the industrial waste received at the

5    Facilities and its origins, EcoRights alleges that CalPeco's activities constitute receipt of

6    industrial waste, including waste from facilities regulated under RCRA Subtitle D and from

7    construction activities, that subjects CalPeco to NPDES regulation under the General Permit.

8        84.    No single industry description in the classification includes both these industrial

9    waste receipt activities and activities involved with transmission and distribution of electric

10   energy for sale. These industrial waste receipt activities are the same type of activities that would

11   be conducted by a standalone facility receiving industrial waste, namely receipt, separation,

12   storage, transfer, and disposal of these materials. As such, this activity constitutes a "distinct and

13   separate economic activity" at the Facilities. This constitutes a separate "primary activity"

14   triggering the need for General Permit coverage.

15       85.    In addition to the industrial activities falling within specific SIC Codes, EcoRights

16   also alleges that each of the Facilities constitutes an:

17   •   "industrial plant yard" because each of the Facilities consists of a large yard where

18       CalPeco conducts a variety of industrial activities and stores a variety of industrial

19       materials and equipment, as discussed above;

20   •   "material handling site" because CalPeco handles a wide variety of material at each of the

21       Facilities, including Poles, TWW, and metal materials;

22   •   "site used for the storage and maintenance of material handling equipment" because each

23       of the Facilities houses material handling equipment, namely equipment used for the

24       movement, storage, control, and protection of materials, goods, and products, such as

25       transport equipment, forklifts, pallet jacks, and industrial trucks;

26   •   "shipping and receiving area" because each of the Facilities contains receiving areas

27       where CalPeco receives large quantities of raw materials, intermediate and finished

28       products, vehicles, and other equipment used in the service of the electrical transmission

27

1    and distribution system;

2    • "storage area . . . for raw materials, and intermediate and finished products" because

3    CalPeco stores raw materials and intermediate and finished products (including Poles,

4    metal pipe, and other intermediate and finished products) at each of the Facilities; and

5    • area where "industrial activity has taken place in the past and significant materials

6    remain" because, as discussed elsewhere herein, significant materials (namely Dioxins

7    and/or other pollutants) remain on each of the Facilities.

8    86.    Accordingly, the Facilities meet the narrative description of "industrial activity"

9    set forth in EPA's regulations and the General Permit, Attachment C. As a result, the Facilities

10   are conducting "industrial activity" triggering the need for General Permit coverage, regardless of

11   whether or not the activities at the Facilities otherwise fall within the SIC Codes that trigger

12   coverage under the General Permit.

13   **B.    CalPeco Is Violating the CWA By Discharging Pollutants from Point Sources**

14   **to Waters of the United States without an NPDES Permit.**

15   87.    Because CWA discharge prohibitions apply to the Facilities, CalPeco is violating

16   CWA section 301(a), 33 U.S.C. § 1311(a), by discharging pollutants from point sources into

17   waters of the United States without NPDES permit authorization.

18   **1.    CalPeco Is "Discharging Pollutants" from the Facilities.**

19   88.    The "discharge of a pollutant" means "any addition of any pollutant to navigable

20   waters from any point source." 33 U.S.C. § 1362(12). Under CWA regulations, this includes

21   "discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other

22   person which do not lead to a treatment works." 40 C.F.R. § 122.2.

23   89.    CalPeco stores Poles and TWW and other sources of pollutants in outdoor,

24   uncovered areas where they are exposed to storm water and snow melt at the Facilities. These

25   Poles and TWW are, on information and belief, treated with the Wood Treatment Mixtures,

26   which contain numerous toxic chemicals, including Dioxins, arsenic, hexavalent chromium,

27   copper naphthenate, and/or DCOI.

28   90.    CalPeco's handling, storage, treatment, transportation, and disposal of materials

treated with Wood Treatment Mixtures outdoors without cover at the Facilities leads to the discharge of pollutants including Wood Treatment Mixtures Waste. Poles are stored outdoors in uncovered areas, on racks and directly on the ground. TWW is stored outdoors in uncovered areas, on racks, directly on the ground, or in TWW bins that are open and uncovered. The Poles and TWW are thus exposed to stormwater and snowfall at the Facilities. The Wood Treatment Mixtures Waste drips off of the Poles or otherwise becomes mobilized from the Poles. The Wood Treatment Mixtures Waste drips off the TWW, is carried off the TWW when mobilized by storm water or snowfall coming into contact with the TWW, and/or is carried off the TWW when pieces of the TWW break or fall off during storage, transport, and handling. The Wood Treatment Mixtures used to treat Poles and TWW, and their associated contaminants, drip and leach during precipitation events from the treated Poles and TWW, becoming Wood Treatment Mixtures Waste and impacting site soils, surface water bodies, and groundwater.  Pollutants mobilized in the storm water or snow melt drip or flow onto the ground beneath the TWW bins or stored Poles. During precipitation events, the Poles and TWW discharge Wood Treatment Mixtures Waste, which is often visible in storm water as an emulsion or oily "sheen" that takes its appearance from the oil-based carrier fluid used in the Wood Treatment Mixtures to treat the Poles and TWW. The Wood Treatment Mixtures Waste mobilized from Poles and TWW is picked up in storm water and/or snow melt flowing over the surface of the Facilities and discharges into storm drains and nearby water bodies, including, but not limited to, Lake Tahoe, which is a water of the United States for CWA purposes.

91.     In addition, at the Facilities, CalPeco houses and stores a variety of light duty and heavy duty cars, trucks, and other transportation and service equipment in outdoor areas where they are exposed to storm water runoff. Service vehicles, backhoe loaders, and other rolling stock track dust, particulate matter, and other contaminants to areas on and off the premises at the Facilities, including Wood Treatment Mixtures Waste. These vehicles also expose other pollutants and sources of pollutants to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

92.     CalPeco also stores various construction materials and equipment at the Facilities

in outdoor, uncovered areas that serve as sources of loading to storm water runoff from the Facilities. This includes electric transmission and distribution system components and associated items.

93.     According to the site visit in August of 2024 and EcoRights' sampling of soils at the Facilities, chemical and industrial wastes in CalPeco's storm water at the Facilities include but are not limited to Dioxins and/or other chemicals which are "pollutants" under the CWA. *See* 33 U.S.C. § 1362(6).

94.     On information and belief, Dioxins and other pollutants discussed above are picked up by storm water and/or snow melt on the Facilities. From there, these pollutants are transported over the surface of the land and/or through other conveyances, including through the MS4, into waters of the United States, including but not limited to, Lake Tahoe and the valuable wetlands and other waters within and adjacent to Lake Tahoe, which are all waters of the United States for CWA purposes.

95.     In addition, pollutants are also discharged from the Facilities by tracking from vehicles and/or foot traffic and/or by wind, leaf blower, sweeping, power washing, and/or other natural or artificial processes that are designed to or do move material from one area to another. Once soil, sediment, grit, and/or other material contaminated with Dioxins, and/or other pollutants is transported into public streets or other areas outside the Facilities, storm water and/or snow melt picks up this contaminated material and transports it into receiving waters and/or the MS4 and/or other conveyances that lead to receiving waters including, but not limited to, Lake Tahoe and the valuable wetlands and other waters within and adjacent to Lake Tahoe, which are all waters of the United States for CWA purposes.

## 2.     CalPeco Is Discharging Pollutants from a "Point Source" at the Facilities.

96.     The CWA defines "point source" as "any discernible, confined, and discrete conveyance including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutant are or may be discharged." 33 U.S.C. § 1362(14). A discharger may

discharge through another entity's point source. 40 C.F.R. 122.2 (defining "discharge of a pollutant" as "discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other person which do not lead to a treatment works.").

97.     Storm water and snow melt runoff from 701 National is conveyed into receiving waters via driveways leading into and out of the 701 National Facility; culverts; an underground storm water conveyance system; ditches, gutters, and other conveyances and surface channels at and adjacent to the 701 National Facility; drop inlets that connect with the underground storm water conveyance system, the Storm Sewer System, receiving waters, and other conveyances that connect these drop inlets to receiving waters; and/or other conveyances at the 701 National Facility that discharge to receiving waters either directly over land or through the Storm Sewer System.

98.     Storm water and snow melt runoff from 933 Eloise is conveyed into receiving waters via driveways leading into and out of the 933 Eloise Facility; culverts; an underground storm water conveyance system; ditches, gutters, and other conveyances and surface channels at and adjacent to the 933 Eloise Facility; drop inlets that connect with the underground storm water conveyance system, the Storm Sewer System, receiving waters, and other conveyances that connect these drop inlets to receiving waters; and/or other conveyances at the 933 Eloise Facility that discharge to receiving waters either directly over land or through the Storm Sewer System.

99.     Storm water and snow melt runoff from 799 Deer is conveyed into receiving waters via driveways leading into and out of the 799 Deer Facility; culverts; ditches, gutters, and other conveyances and surface channels at and adjacent to the 799 Deer Facility; receiving waters and other conveyances that connect to receiving waters; and/or other conveyances at the 799 Deer Facility that discharge to receiving waters over land.

100.     The conveyances described above at each of the Facilities are all "point sources" under the CWA. *See* 33 U.S.C. § 1362(14). Also, each Facility is itself a point source. It is well established that a facility, such as each of the three Facilities, can be a point source for CWA purposes. *See S.F. BayKeeper v. Tidewater Sand & Gravel Co.*, No. 96-01531, 1997 U.S. Dist. LEXIS 22602, at *20-24 (N.D. Cal. Sep. 9, 1997). In the alternative, even if these were not direct

1    discharges, which they are, they would be indirect discharges that are the functional equivalent of

2    direct discharges under *Cty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462 (2020). These

3    discharges would reach a water of the United States quickly and over a short distance, which is

4    sufficient under *Cnty. Of Maui*. As a result, the Facilities are discharging storm water and/or snow

5    melt via numerous types of point sources.

6         101.    Storm water and/or snow melt on CalPeco's 701 National Facility flows across the

7    701 National Facility's parking lot to storm drain drop inlets, which then convey the storm water

8    and/or snow melt via an underground storm water conveyance system to a sand/oil separator,

9    which discharge to conveyances on Shelter Road and/or a conveyance beneath Shelter Road to a

10   detention basin. Storm water and/or snow melt also flows south across the parking lot at 701

11   National to two driveways, which discharge to conveyances on Shelter Road. The discharges to

12   conveyances on Shelter Road then enter the Storm Sewer System on National Avenue or flow

13   through culverts, ditches, and/or other conveyances south to Lake Tahoe, its tributaries, and the

14   valuable wetlands and other waters within and adjacent to those waters, all of which are waters of

15   the United States for CWA purposes. This is supported by CalPeco's own maps, EcoRights'

16   observations, and documents obtained from government agencies.

17        102.    Storm water and/or snow melt on CalPeco's 933 Eloise Facility flows across the

18   933 Eloise parking lot to drop inlets, which then convey the storm water and/or snow melt via an

19   underground storm water conveyance system to a storm water detention system, which then

20   discharges from an outfall pipe to an unnamed drainage channel, and then flows through culverts,

21   ditches, and/or other conveyances north to Tahoe Keys, Lake Tahoe, its tributaries, and the

22   valuable wetlands and other waters within and adjacent to those waters, all of which are waters of

23   the United States for CWA purposes. Storm water and/or snow melt also flows off the parking lot

24   at 933 Eloise via driveways and other conveyances to Dunlap Drive and/or Patricia Lane. The

25   discharges to conveyances on Dunlap Drive and/or Patricia Lane enter the Storm Sewer System

26   or flow through culverts, ditches, and/or other conveyances north to Tahoe Keys, Lake Tahoe, its

27   tributaries, and the valuable wetlands and other waters within and adjacent to those waters, all of

28   which are waters of the United States for CWA purposes. This is supported by CalPeco's own

1   maps, EcoRights' observations, and documents obtained from government agencies.

2       103.    Storm water and/or snow melt on CalPeco's 799 Deer Facility is channeled and/or

3   conveyed through culverts, ditches, and/or other conveyances along Deer Street. The discharges

4   to conveyances on Deer Street then enter the Storm Sewer System on Speckled Avenue or flow

5   through culverts, ditches, and/or other conveyances south to Lake Tahoe, its tributaries, and the

6   valuable wetlands and other waters within and adjacent to those waters, all of which are waters of

7   the United States for CWA purposes. Storm water and/or snow melt on CalPeco's 799 Deer

8   Facility is also channeled and/or conveyed through culverts, ditches, and/or other conveyances to

9   Griff Creek, which flows south to Lake Tahoe, its tributaries, and the valuable wetlands and other

10  waters within and adjacent to those waters, all of which are waters of the United States for CWA

11  purposes. This is supported by CalPeco's own maps, EcoRights' observations, and documents

12  obtained from government agencies.

13          **3.      Pollutants From the Facilities Reach "Waters of the United States."**

14      104.    As noted above, the polluted discharges from the three Facilities reach waters of

15  the United States. These include but are not limited to Lake Tahoe and its tributaries, Griff Creek,

16  Tahoe Keys, Pope Marsh, and the valuable wetlands and other waters within and adjacent to those

17  waters.

18      105.    All the above waters are "navigable waters" within the meaning of the CWA.

19  CWA section 33 U.S.C. § 1362(7) defines navigable waters to include waters of the United

20  States, including the territorial seas. Lake Tahoe is an interstate water and is a water which is

21  currently used, or was used in the past, or may be susceptible to use in interstate or foreign

22  commerce. 40 C.F.R. § 120.2(a)(1). Lake Tahoe is a relatively permanent, standing or

23  continuously flowing bodies of water. Lake Tahoe's tributaries and surrounding wetlands,

24  including but not limited to Griff Creek, Tahoe Keys, and Pope Marsh, are relatively permanent,

25  standing or continuously flowing bodies of water that have a continuous surface connection to

26  those waters and are thus "adjacent" to those waters, and are thus also waters of the United States.

27  *See, e.g.,* 40 C.F.R. §§ 120.2(a)(1)-(5).

28          **4.      CalPeco Does Not Have NPDES Authorization for Discharges of**

1    **Pollutants from the Facilities.**

2    106.    Despite the fact that CalPeco is obligated to obtain General Permit coverage for

3    the three Facilities, on information and belief, CalPeco has not filed NOIs to be covered by and

4    comply with the terms of the General Permit with respect to the Facilities. Nor does CalPeco have

5    any individual NPDES permits authorizing its discharges of contaminated storm water and/or

6    snow melt from the Facilities.

7    **5.    The Dates of CalPeco's Violations.**

8    107.    CalPeco has discharged and is continuing to discharge pollutants to waters of the

9    United States as described above. While CalPeco should be aware of each day that it has

10    discharged storm water and/or snow melt from the three Facilities (since the General Permit

11    requires that it monitor such discharges), EcoRights alleges that CalPeco has discharged storm

12    water and/or snow melt containing excessive levels of pollutants from the three Facilities to

13    waters of the United States during at least every significant local rain event over 0.1 inches of

14    rainfall in the last five years preceding the May 2024 Notice Letter. Each discharge of pollutants

15    from each of the Facilities to waters of the United States without NPDES permit authorization

16    constitutes a separate CWA violation. CalPeco's violations will continue each day when a

17    significant local rain event occurs with over 0.1 inches of rainfall and pollutants are discharged

18    without a permit in violation of CWA requirements.

19    **C.    CalPeco's Discharges Are in Violation of the General Permit.**

20    108.    CalPeco, through the 701 National Facility, 933 Eloise Facility, and 799 Deer

21    Facility, discharges storm water associated with the above-noted industrial activities that is

22    contaminated with pollutants without NPDES authorization under the General Permit. The

23    General Permit only authorizes such discharges conditioned on compliance with the terms of the

24    General Permit. Each of these permit terms constitutes an "effluent limitation" within the

25    meaning of CWA section 505(f), 33 U.S.C. § 1365(f). On information and belief, CalPeco's

26    storm water and/or snow melt discharges have violated several of these permit terms, thereby

27    violating CWA effluent limitations. Even if CalPeco were to send one or more NOIs to the State

28    Board and acquire NPDES permit authorization under the General Permit, the violations

1    described herein will remain ongoing as CalPeco has not met, and will not in the future meet, the

2    requirements of the General Permit regarding the Facilities.

3    **1.    Discharges in Violation of BPT/BAT/BCT Effluent Limitations.**

4    109.    CWA section 301(b), 33 U.S.C. § 1311(b), prohibits the discharge of pollutants

5    from point sources that violate the effluent limitations imposed by that subsection. Specifically,

6    CWA section 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A), prohibits the discharge of pollutants from

7    point sources that exceed a level commensurate with the application of best practicable control

8    technology currently available ("BPT"). CWA section 301(b)(2)(A), 33 U.S.C. § 1311(b)(2)(A),

9    prohibits the discharge of pollutants from point sources that exceed a level commensurate with

10   the application of best available technology economically achievable ("BAT"). CWA section

11   301(b)(2)(E), 33 U.S.C. § 1311(b)(2)(E), prohibits the discharge of pollutants from point sources

12   that exceed a level commensurate with the application of best conventional pollutant control

13   technology ("BCT"). EPA has published Benchmark Values set at the maximum level of

14   pollutant loading generally expected if an industrial facility is employing BPT, BAT, and BCT.[4]

15   110.    CalPeco has failed to employ measures at the Facilities that constitute BPT, BAT,

16   and BCT for similar facilities, such as: moving pollution generating activities under cover or

17   indoors; capturing and effectively filtering or otherwise treating all storm water prior to

18   discharge; routing storm sewer discharges to publicly owned treatment works (following

19   treatment necessary to meet pretreatment standards); using regenerative sweepers and

20   periodically power washing the Facilities to reduce the build-up of pollutants on-site; washing

21   tires or employing other measures to prevent off-site tracking of pollutants; and other like

22   measures for reducing storm water pollutant discharges to the limits of available, economically

23   achievable technology.

24   111.    Because CalPeco is discharging pollutants from the Facilities in the absence of the

25   implementation of BPT, BAT, and BCT, CalPeco is violating the effluent limitations imposed by

26   CWA section 301(b). While CalPeco should be aware of each day that it has discharged storm

27

28   [4] These Benchmark Values can be found at https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_fs.pdf.

water and/or snow melt from the Facilities, EcoRights alleges that CalPeco has discharged storm

water and/or snow melt containing excessive levels of pollutants from the three Facilities to

waters of the United States during at least every significant local rain event over 0.1 inches of

rainfall in the last five years preceding the May 2024 Notice Letter.

112.    CalPeco's unlawful discharges of storm water and snow melt from the Facilities

with levels of pollutants exceeding BPT, BAT, and BCT levels of control continue to occur

during all significant rain events over 0.1 inches of rainfall. Each discharge of storm water, snow

melt, and non-storm water from the Facilities after the effective date of the BPT, BAT, and BCT

requirements constitutes a separate violation of the CWA. CalPeco is subject to civil penalties for

violations of the CWA within the past five years preceding the May 2024 Notice Letter.

113.    Further, in the General Permit, the State Board established Numeric Action Limits

("NALs"), which serve a similar purpose to BPT, BAT, and BCT. As discussed above, CalPeco

has failed to employ measures at the Facilities that constitute BPT, BAT, and BCT for similar

facilities, such as: moving pollution generating activities under cover or indoors; capturing and

effectively filtering or otherwise treating all storm water prior to discharge; routing storm sewer

discharges to publicly owned treatment works (following treatment necessary to meet

pretreatment standards); using regenerative sweepers and periodically power washing the

Facilities to reduce the build-up of pollutants on-site; washing tires or employing other measures

to prevent off-site tracking of pollutants; and other like measures for reducing storm water

pollutant discharges to the limits of available, economically achievable technology. This has led

to CalPeco's failure to comply with the State Board NALs, which represents further violation of

the CWA.

114.    CalPeco has discharged storm water containing excessive levels of pollutants from

the Facilities to waters of the United States during at least every significant local rain event over

0.1 inches of rainfall in the last five years preceding the May 2024 Notice Letter.

115.    CalPeco's unlawful discharges of storm water and/or snow melt from the Facilities

with levels of pollutants exceeding NALs continue to occur presently and will in the future

continue during all significant rain events. Each discharge of storm water, snow melt, and non-

36

storm water from the Facilities after the effective date of the NAL requirements constitutes a separate violation of the General Permit and the CWA. CalPeco is subject to civil penalties for violations of the General Permit and the CWA within the past five years preceding the May 2024 Notice Letter.

116.    CalPeco's continued discharge of storm water containing levels of pollutants above NALs, BPT, BAT, and BCT necessarily means that CalPeco has not developed and/or implemented sufficient BMPs at the Facilities to prevent storm water flows from coming into contact with the sources of contaminants at the Facilities or otherwise to control the discharge of pollutants from the Facilities. CalPeco has not developed and/or implemented an adequate SWPPP or Monitoring and Implementation Plan ("MIP") for the Facilities, as required by the terms of the General Permit. This represents an ongoing violation of the General Permit and the CWA. CalPeco is subject to civil penalties for violations of the General Permit and the CWA within the past five years.

**2.    Discharges that Have Impaired Receiving Waters.**

117.    The Discharge Prohibitions of the General Permit, § III, prohibit storm water discharges that cause or threaten to cause pollution, contamination, or nuisance, as well as those that adversely impact human health or the environment. The Receiving Water Limitations of the General Permit, § VI, prohibit storm water discharges that cause or contribute to an exceedance of applicable Water Quality Standards. Applicable Water Quality Standards are set forth in the California Toxics Rule ("CTR"), 40 C.F.R. § 131.38, and the Water Quality Control Plan for the Lahontan Region ("Basin Plan"). The water quality objectives of the Basin Plan constitute "the allowable limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area." Cal. Water Code § 13050(h). The water quality standards for the Lahontan Region apply to CalPeco's three Facilities.

118.    The Basin Plan provides that the applicable beneficial uses for Lake Tahoe are: municipal and domestic supply including but not limited to drinking water supply, agricultural supply including but not limited to irrigation and stock watering, ground water recharge,

navigation, water contact recreation, noncontact water recreation, commercial and sportfishing, cold freshwater habitat, wildlife habitat, preservation of biological habitats of special significance, migration of aquatic organisms, and spawning, reproduction, and development of fish and wildlife. *See* Basin Plan at 2-17. The beneficial uses for wetlands surrounding Lake Tahoe including Pope Marsh are: municipal and domestic supply including but not limited to drinking water supply, ground water recharge, water contact recreation, noncontact water recreation, cold freshwater habitat, wildlife habitat, water quality enhancement, flood peak attenuation and flood water storage. *Id.*

119.    Chapter 5 of the Basin Plan states that Lake Tahoe is an Outstanding National Resource Water ("ONRW") pursuant to the CWA. *Id.* at 5-1. Lake Tahoe is renowned for its extraordinary clarity and purity and deep blue color. *Id.* Where high quality waters constitute an outstanding National resource, such as waters of National Parks, State parks and wildlife refuges, and waters of exceptional recreational or ecological significance, that water quality must be maintained and protected. The ONRW designation for Lake Tahoe provides the maximum amount of protection to the water quality of Lake Tahoe under the CWA, ensuring that no permanent degradation of water quality will occur. Attainment of Lake Tahoe's deep water transparency and productivity standards requires control of nutrient and fine sediment particle loading, which requires *inter alia* export of domestic wastewater and solid waste from the Lake Tahoe watershed and remediation of point source problems. *Id.* Runoff from roadways and other urbanized landscapes are the primary sources of fine sediment particles reaching the lake, which reduces deep water transparency in Lake Tahoe. *Id.*

120.    Chapter 5 of the Basin Plan also sets forth water quality standards and control measures for the Lake Tahoe Basin applicable to CalPeco's stormwater discharges from the Facilities, including but not limited to, "Waters shall not contain biostimulatory substances in concentrations that promote aquatic growths to the extent that such growths cause nuisance or adversely affect the water for beneficial uses" (Basin Plan at 5.1-7); "Waters shall not contain concentrations of chemical constituents in amounts that adversely affect the water for beneficial uses" (Basin Plan at 5.1-7); "Waters designated as MUN shall not contain concentrations of

chemical constituents in excess of the maximum contaminant level ("MCL") or secondary maximum contaminant level ("SMCL") based upon drinking water standards specified in the following provisions of Title 22 of the California Code of Regulations" (Basin Plan at 5.1-7); "Waters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect the water for beneficial uses" (Basin Plan at 5.1-7); "Waters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect the water for beneficial uses" (Basin Plan at 5.1-7); "For natural high quality waters, the concentration of oils, greases, or other film or coat generating substances shall not be altered" (Basin Plan at 5.1-7); "The suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect the water for beneficial uses" (Basin Plan at 5.1-8); "All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life" (Basin Plan at 5.1-8); "Suspended sediment concentrations in streams tributary to Lake Tahoe shall not exceed a 90th percentile value of 60 mg/L" (Basin Plan at 5.1-9).

121.    The levels of pollutants in CalPeco's storm water and snow melt discharges from the Facilities have caused pollution, contamination, or nuisance in violation of the water quality standards and prohibitions from Chapter 3 of the Basin Plan and the Discharge Prohibitions of the General Permit, § III and have caused or contributed to receiving waters not attaining one or more applicable Water Quality Standards from the General Permit, including attainment of the designated beneficial uses of the receiving waters, in violation of the Receiving Water Limitations of the General Permit, § VI.

122.    As discussed above, the Dioxins concentrations in the storm water and snow melt discharges, and soil, at the Facilities exceed applicable regulatory agency ESLs set at levels deemed necessary to protect human health and the environment. In addition, these pollutants are known to cause "detrimental physiological responses in human, plant, animal, or aquatic life," and are causing "bioaccumulation of pesticide concentrations in bottom sediments or aquatic life

1    that cause nuisance or adversely affect beneficial uses."

2        123.    Each day that CalPeco has discharged storm water and/or snow melt from the

3    Facilities, its storm water and/or snow melt contained levels of pollutants that caused or

4    contributed to exceedance of one or more of the applicable Water Quality Standards. CalPeco has

5    discharged storm water and/or snow melt from the Facilities during at least every significant local

6    rain event over 0.1 inches of rainfall that has caused or contributed to Water Quality Standards

7    not being met in the applicable receiving waters over the last five years preceding the May 2024

8    Notice Letter.

9        124.    CalPeco's unlawful pollutant discharges from the Facilities continue to occur

10    presently and will continue to occur during all significant rain events over 0.1 inches of rainfall.

11    Each discharge from the Facilities that causes or contributes to an exceedance of an applicable

12    Water Quality Standard constitutes a separate violation of the General Permit and the CWA.

13    CalPeco is subject to penalties for violations of the General Permit and the CWA within the past

14    five years preceding the May 2024 Notice Letter. Significant local precipitation events are

15    reflected in the rain gauge data shown in Attachment B of the May 2024 Notice Letter, available

16    at https://www.ncdc.noaa.gov/cdoweb/search.

17        **3.    Violation of General Permit Conditions Related to Development and**

18        **Implementation of an Adequate Storm Water Pollution Prevention**

19        **Plan.**

20        125.    The General Permit requires dischargers to develop and implement an adequate

21    SWPPP and to make all necessary revisions to existing SWPPPs promptly. The General Permit

22    also requires the SWPPP to include minimum BMPs and advanced BMPs. *See* General Permit §

23    X.A-I.

24        126.    The SWPPP must include, among other requirements, the following: (a)

25    Specification of BMPs designed to reduce pollutant discharge to BPT, BAT, and BCT levels,

26    including BMPs already existing and BMPs to be adopted or implemented in the future. *See*

27    General Permit § X.A-I; and (b) Revisions to the SWPPP within 90 days after a facility manager

28    determines that the SWPPP is in violation of any requirements of the General Permit. *Id.*

127.    CalPeco has failed to adopt a SWPPP for the each of the Facilities that meets these requirements. CalPeco's failures to prepare an adequate SWPPP for the Facilities and/or to revise the SWPPPs in all the above respects constitute violations of the General Permit, § X. CalPeco will continue to be in violation every day that it fails to develop and implement an adequate SWPPP for the Facilities. CalPeco is subject to penalties for violations of the General Permit and the CWA occurring within the past five years preceding the May 2024 Notice Letter.

**4.    Failure to Develop and Implement an Adequate Monitoring and Implementation Plan and Perform Annual Comprehensive Site Compliance Evaluations as Required by the General Permit.**

128.    Under the General Permit, dischargers are required to prepare and implement a monitoring and implementation plan ("MIP") as part of their SWPPP. General Permit, § I. The MIP requirements in the General Permit specify visual observation procedures and locations and sampling procedures, locations, and methods with which dischargers must comply. General Permit, Sections I; XI.

129.    Pursuant to the monitoring and reporting requirements of the General Permit, facility operators must conduct and record visual observations of all drainage locations at facilities for authorized non-storm water, unauthorized non-storm water, and storm water discharges. Facility operators must also implement responsive measures to eliminate unauthorized non-storm water discharges and reduce or prevent pollutants from contacting non-storm water discharges and to reduce or prevent pollutants in storm water discharges. Facility operators must document the presence of any floating or suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants. Facility operators must maintain records of observation dates, locations observed, observations, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges. General Permit, § XI.

130.    In addition to conducting visual observations, facility operators are required to collect and analyze storm water samples during qualifying storm events. General Permit, § XI.

131.    To achieve the objectives of the monitoring program, facility operators must

comply with certain procedural requirements, including explaining monitoring methods; providing a description of the visual observation and sampling methods, location, and frequency; and identifying the analytical methods and corresponding method of detection limits used to detect pollutants in storm water discharges. General Permit, § XI. Facility operators must retain records of all storm water monitoring information and copies of all reports for at least five years. *Id*. § XI.J. Facility operators must submit an Annual Report by July 1 each year to the Regional Board that includes a summary of visual observations and sampling results, laboratory reports, the Annual Comprehensive Site Compliance Evaluation Report, an explanation of why the facility did not implement any required activities, and specified records. *Id*. §§ XI.C, XVI.

132.    CalPeco has been operating the Facilities with an inadequately developed and/or inadequately implemented MIP in violation of the substantive and procedural requirements set forth above. CalPeco's monitoring program has not ensured that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the General Permit. The monitoring program has not resulted in practices at the Facilities that adequately reduce or prevent pollutants in storm water as required by the General Permit. CalPeco's MIP has not effectively identified compliance problems at the Facilities or resulted in effective revision of the SWPPPs to address such pollution problems as required by General Permit sections X and XI.

133.    CalPeco has not submitted annual reports to the applicable Regional Board in the last five years preceding the May 2024 Notice Letter. CalPeco has failed to sample storm water from all discharge points at the Facilities, including gaps in berms or other locations. CalPeco has failed to analyze its discharges for all toxic chemicals and other pollutants likely to be present in significant amounts in the Facilities' storm water and/or snow melt discharges. CalPeco has failed to complete all required visual observations. Accordingly, CalPeco has violated the monitoring and reporting provisions as specified by General Permit section XI every day for the last five years preceding the May 2024 Notice Letter.

134.    As a result of CalPeco's failure to adequately develop and/or implement an adequate MIP at the Facilities, CalPeco has been in daily and continuous violation of the General

Permit and the CWA on each and every day for the last five years preceding the May 2024 Notice Letter. These violations are ongoing. CalPeco will continue to be in violation of the General Permit's monitoring and reporting requirements every day it fails to adequately develop and implement an effective MIP for each of the three Facilities. CalPeco is subject to penalties for each violation of the General Permit and the CWA occurring for the last five years preceding the May 2024 Notice Letter.

**III.    Receiving Waters and Wildlife Affected by CalPeco's Violations of the General Permit and the CWA.**

135.    The storm water and snow melt that CalPeco discharges from the Facilities flows into various waterways and natural resource areas used by humans, pets, and wildlife. In addition, the soils and sediments tracked from the Facilities are carried by storm water runoff into storm drains off-site that flow into various waterways used by humans, pets, and wildlife. These uses are described in the paragraphs below.

136.    The receiving waters and natural resources affected by the discharges of pollutants from the Facilities include, but are not limited to, Lake Tahoe and its tributaries, and the valuable riparian, wetland, shore, and other areas within and adjacent to those waters and lands, including those species that occupy, use, migrate through, reside, breed, and/or forage in and/or around these waters and/or natural resources. This also includes, but is not limited to, all waters and natural resources proximate thereto (such as adjacent or nearby wetlands, hiking trails, beaches, preserves, parks, and the like), and those species of plants and animals that occupy, use, migrate through, reside, breed, and/or forage in and around these waters and natural resources.

137.    The storm water and/or snow melt discharges of pollutants from the 933 Eloise Facility also affect the Tahoe Keys, Pope Marsh, and surrounding tributaries; wetlands, streams, and other waters in and near these waters; and the valuable riparian, wetland, shore, and other areas within and adjacent to those waters and lands, including those species that occupy, use, migrate through, reside, breed, and/or forage in and/or around these waters and/or natural resources. This also includes, but is not limited to, all waters and natural resources proximate thereto (such as adjacent or nearby wetlands, hiking trails, beaches, preserves, parks, and the

43

like), and including those species of plants and animals that occupy, use, migrate through, reside, breed, and/or forage in and around these waters and natural resources.

138.    The storm water and/or snow melt discharges of pollutants from the 799 Deer Facility also affect Griff Creek and surrounding tributaries; wetlands, streams, and other waters in and near these waters; and the valuable riparian, wetland, shore, and other areas within and adjacent to those waters and lands, including those species that occupy, use, migrate through, reside, breed, and/or forage in and/or around these waters and/or natural resources. This also includes, but is not limited to, all waters and natural resources proximate thereto (such as adjacent or nearby wetlands, hiking trails, beaches, preserves, parks, and the like), and including those species of plants and animals that occupy, use, migrate through, reside, breed, and/or forage in and around these waters and natural resources.

139.    As noted above, solid or hazardous waste from the Poles and TWW is disposed when the Wood Treatment Mixtures used to treat the Poles and TWW spills, leaks, discharges, and/or drips from the Poles and TWW, becoming Wood Treatment Mixtures Waste, and is released into the environment. This toxic Wood Treatment Mixtures Waste contaminates the surface areas, storm drains, and/or water bodies adjoining and/or near the Facilities at which CalPeco stores these Poles and TWW, as well as those downstream. In addition, the Wood Treatment Mixtures Waste discharged by the Poles and TWW infiltrates into and contaminates soils and groundwater. This occurs in areas offsite of the Facilities, including unpaved areas adjacent to and/or near the Facilities; onsite at the Facilities' grounds in unpaved areas; and in areas downstream that receive contaminated storm water and snow melt runoff from the Facilities. For example, the 701 National Facility discharges storm water and/or snow melt from the Pole storage area into a stormwater conveyance system with an infiltration system, and overflows through an outfall pipe into an unnamed channel on the north west side of the 701 National Facility. This storm water and/or snow melt is contaminated with the toxic Wood Treatment Mixtures Waste and infiltrates into the ground and groundwater in addition to being carried to waters of the United States over land and/or via the Storm Sewer System and/or other conveyances. In addition, the toxic Wood Treatment Mixtures Waste travels in storm water

and/or snow melt discharged from driveways at the 701 National Facility to unpaved areas downstream of the 701 National Facility where it infiltrates into the ground and groundwater. On information and belief, groundwater contamination occurs in areas including, but not limited to, the unnamed channel on the north west side of the 701 National Facility property, Lake Tahoe, Lake Tahoe's tributaries, and surrounding wetland and riparian areas. When contaminated groundwater subsequently connects with and discharges to surface waters, those surface waters are also contaminated with the Wood Treatment Mixtures Waste discharged from the Facilities. In addition, the toxic Wood Treatment Mixtures Waste contaminates the Facilities themselves. In particular, the Wood Treatment Mixtures Waste contaminates soils and standing water at the Facilities, such as puddles, where birds, squirrels, gophers, insects, arachnids, centipedes, millipedes, snails, and other wildlife come into contact with, and are harmed by, the contaminants.

140. Additional sources of solid or hazardous waste that is heavily contaminated with the Wood Treatment Mixtures Waste that is disposed of, released or further distributed to the environment from the Poles and TWW are as follows: (1) when CalPeco employees make contact with the Poles and TWW, wood chips are frequently dislodged from the Poles and TWW and fall to the ground and are then spread around the Facilities or are tracked off of the Facilities by vehicles or in storm water or snow melt; (2) when CalPeco prepares the Poles for field placement and drills holes in, or saws into, the Poles thus generating sawdust that is released onto the Facilities or is tracked off of the Facilities by vehicles or in storm water or snow melt; and/or (3) when CalPeco prepares the Poles and TWW for disposal and generates sawdust by cutting the Poles and TWW, which is released onto the Facilities or is tracked off the Facilities by vehicles or in storm water or snow melt.

141. The affected lands and waters are home to many species of wildlife and their habitat, which are harmed by CalPeco's discharges. The aquatic species harmed by CalPeco's actions include rainbow trout, brook trout, brown trout, lake trout, Kokanee salmon, crayfish, mysis shrimp, and other fish and aquatic species. Wildlife harmed include various species of terrestrial wildlife such as bear, beaver, coyote, squirrel, mule deer, raccoon, marmot, and other

wildlife, and plant species. Migratory and non-migratory birds harmed include osprey, bald eagle, blue jay, other jay species, Western tanager, mallard duck and other species of duck, Canadian geese, other species of geese, various species of woodpeckers, various species of falcons, Mountain Chickadee, and other chickadee species. The species harmed also include various species listed under the ESA and their designated critical habitats including the Federally endangered South Sierra DPS of foothill yellow-legged frog (*Rana boylii*), and the Federally threatened Lahontan cutthroat trout (*Oncorhynchus clarki henshawi*). This also includes harm to other animals higher up the food chain that feed on contaminated benthic organisms and animals that feed on those animals, including, but not limited to humans who eat contaminated fish or shellfish. Humans may also be harmed when exposed to contaminated water or soil during water contact activities and when they make contact with contaminated water and soil during their daily activities or otherwise.

**IV.    CalPeco's Knowing Discharges and Releases of the Listed Chemicals Into Water or Onto Land Where They Pass or Probably Will Pass Into a Source of Drinking Water Violates Proposition 65.**

142.    As discussed above, Proposition 65 provides that "[n]o person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in [California Health & Safety Code §] 25249.9." California Health & Safety Code § 25249.5.

143.    CalPeco is a "person in the course of doing business" for the purposes of Proposition 65 because it employs more than 10 individuals. California Health & Safety Code § 25249.11(b).

144.    As discussed above, by its actions and inactions, CalPeco discharges or releases the Wood Treatment Mixtures Waste from the three Facilities, and the Wood Treatment Mixtures Waste contains certain Listed Chemicals.

145.    CalPeco's discharges or releases from the 701 National Facility include, but are

1    not limited to, discharges or releases of Listed Chemicals from the storm drain inlets, storm water

2    conveyance system, and sand/oil water separator at the 701 National Facility where the Listed

3    Chemicals are contained until storm water and/or snow melt with Listed Chemicals are

4    discharged or released from the 701 National Facility; discharges or releases from other

5    conveyances at the 701 National Facility; discharges or releases of any Listed Chemicals, whether

6    in solid or liquid form, from the 701 National Facility in any location from which they were

7    previously contained on the 701 National Facility grounds; discharges or releases of the Listed

8    Chemicals from Poles and TWW at the 701 National Facility; discharges or releases that occur

9    when CalPeco or entities hired by CalPeco clean out the storm water conveyance system and/or

10   sand/oil water separator at the 701 National Facility; discharges or releases that occur when

11   CalPeco pressure washes sweeps, or otherwise cleans the grounds of the 701 National Facility,

12   causing the Listed Chemicals to leave the 701 National Facility; and discharges or releases of the

13   Listed Chemicals that are within TWW that is created at the 701 National Facility in the form of

14   sediment, sawdust, wood chips, wood slivers, and other particulates and/or waste oils that are

15   subsequently discharged or released from the 701 National Facility by natural or artificial means.

16        146.    CalPeco's discharges or releases from the 933 Eloise Facility include, but are not

17   limited to, discharges or releases of Listed Chemicals from the storm drain inlets, storm water

18   conveyance system, storm water infiltration system, and outfall pipe at the 933 Eloise Facility

19   where the Listed Chemicals are contained until storm water and/or snow melt with Listed

20   Chemicals are discharged or released from the 933 Eloise Facility; discharges or releases from

21   other conveyances at the 933 Eloise Facility; discharges or releases of any Listed Chemicals,

22   whether in solid or liquid form, from the 933 Eloise Facility in any location from which they were

23   previously contained on the 933 Eloise Facility grounds; discharges or releases of the Listed

24   Chemicals from Poles and TWW at the 933 Eloise Facility; discharges or releases that occur

25   when CalPeco or entities hired by CalPeco clean out the storm water conveyance system and/or

26   storm water infiltration system and/or outfall pipe at the 933 Eloise Facility; discharges or

27   releases that occur when CalPeco pressure washes sweeps, or otherwise cleans the grounds of the

28   933 Eloise Facility, causing the Listed Chemicals to leave the 933 Eloise Facility; and discharges

or releases of the Listed Chemicals that are within TWW that is created at the 933 Eloise Facility in the form of sediment, sawdust, wood chips, wood slivers, and other particulates and/or waste oils that are subsequently discharged or released from the 933 Eloise Facility by natural or artificial means.

147.    CalPeco's discharges or releases from the 799 Deer Facility include, but are not limited to, discharges or releases of Listed Chemicals from the culverts, ditches, and/or other conveyances at the 799 Deer Facility where the Listed Chemicals are contained until storm water and/or snow melt with Listed Chemicals are discharged or released from the 799 Deer Facility; discharges or releases from other conveyances at the 799 Deer Facility; discharges or releases of any Listed Chemicals, whether in solid or liquid form, from the 799 Deer Facility in any location from which they were previously contained on the 799 Deer Facility grounds; discharges or releases of the Listed Chemicals from Poles at the 799 Deer Facility; and discharges or releases that occur when CalPeco cleans the grounds of the 799 Deer Facility, causing the Listed Chemicals to leave the 799 Deer Facility.

148.    The Wood Treatment Mixtures Waste includes the Listed Chemicals, all of which are known to the State of California to cause cancer or reproductive toxicity (pentachlorophenol (cancer); pentachlorophenol and by-products of its synthesis (complex mixture) (cancer); polychlorinated dibenzo-p-dioxins (cancer); polychlorinated dibenzofurans (cancer); 2,3,7,8-Tetrachlorodibenzo-p-dioxin (TCDD) (cancer and developmental toxicity); hexachlorodibenzodioxin (cancer)). Therefore, CalPeco discharges or releases chemicals known to the State of California to cause cancer or reproductive toxicity from the Facilities.

149.    Such discharge or release is knowing because, on information and belief, CalPeco has long known, or reasonably should have known, independently, that its actions at the Facilities result in the discharge or release of the Listed Chemicals. However, even if CalPeco were not independently aware, (1) on or about May 24, 2024, EcoRights sent the May 2024 Notice Letter to CalPeco, detailing RCRA and CWA violations related to its release or discharge of the Listed Chemicals from the three Facilities; (2) EcoRights has provided CalPeco with laboratory reports documenting the presence of the Listed Chemicals in soil that has come into contact with storm

48

water and/or snow melt runoff from the Facilities and/or Wood Treatment Mixtures drippage on the grounds of the Facilities; (3) EcoRights provided CalPeco with the June 2024 Notice Letter on or about June 10, 2024, which further detailed CalPeco's discharges or releases of the Listed Chemicals; and (4) it is common knowledge in the utility industry, of which CalPeco is part, that utility poles and crossarms treated with pentachlorophenol leach, drip, and ooze pentachlorophenol and Dioxins onto the ground and into storm water and/or snow melt runoff from areas where pentachlorophenol treated utility poles and crossarms are stored and CalPeco is well aware that it is storing pentachlorophenol treated wood where it is exposed to rainfall.

150.    On information and belief, CalPeco is independently aware that its discharge or release of the Listed Chemicals from the 701 National Facility discharges or releases to the detention pond on the other side of Shelter Road from 701 National, to the Storm Sewer System which then discharges to Lake Tahoe, and/or to groundwater near the 701 National Facility. For example, one of CalPeco's own maps indicates some of its storm water flows to a storm water conveyance system that discharges from the oil water separator to either the detention pond on the other side of Shelter Road where the discharges then infiltration into groundwater, or the Storm Sewer System, which then flows to Lake Tahoe. However, even if CalPeco were not independently aware, (1) on or about May 24, 2024, EcoRights sent the May 2024 Notice Letter to CalPeco, detailing RCRA and CWA violations related to CalPeco's release or discharge of the Listed Chemicals from the 701 National Facility to the detention pond, groundwater, and Lake Tahoe; (2) EcoRights provided CalPeco with the June 2024 Notice Letter on or about June 10, 2024, which further discussed the discharges or releases of Listed Chemicals from the 701 National Facility to sources of drinking water; (3) CalPeco's own maps and photographs show that the storm water conveyance system at the 701 National Facility discharges to the unlined detention pond on the other side of Shelter Road as well as to the Storm Sewer Sysem; and (4) based on the 701 National Facility's location and downward grade towards the south, it is common knowledge that storm water and/or snow melt from the 701 National Facility would generally flow into groundwater and/or flow downstream to Lake Tahoe.

151.    On information and belief, CalPeco is independently aware that its discharge or

1    release of the Listed Chemicals from the 933 Eloise Facility discharges or releases to the

2    unnamed channel on the north west corner of the property in South Lake Tahoe, California,

3    and/or to groundwater near the 933 Eloise Facility. For example, one of CalPeco's own maps

4    indicates some of its storm water flows to a storm water conveyance system that discharges from

5    an outfall pipe to the unnamed creek, which then flows to Lake Tahoe. However, even if CalPeco

6    were not independently aware, (1) on or about May 24, 2024, EcoRights sent the May 2024

7    Notice Letter to CalPeco, detailing RCRA and CWA violations related to CalPeco's release or

8    discharge of the Listed Chemicals from the 933 Eloise Facility to the unnamed creek,

9    groundwater, and Lake Tahoe; (2) EcoRights provided CalPeco with the June 2024 Notice Letter

10    on or about June 10, 2024, which further discussed the discharges or releases of Listed Chemicals

11    from the 933 Eloise Facility to sources of drinking water; (3) CalPeco's own maps and

12    photographs show that the outfall pipe from the 933 Eloise Facility discharges to the unlined,

13    unnamed creek on the north west side of the property; and (4) based on the 933 Eloise Facility's

14    location adjacent to the unnamed creek, it is common knowledge that storm water and/or snow

15    melt from the 933 Eloise Facility would generally flow into groundwater and flow downstream to

16    Tahoe Keys and ultimately Lake Tahoe.

17        152.    On information and belief, CalPeco is independently aware that its discharge or

18    release of the Listed Chemicals from the 799 Deer Facility discharges or releases to various

19    culverts, ditches, and other conveyances which then discharge to Griff Creek and/or the Storm

20    Sewer System, which then discharge to Lake Tahoe, and/or to groundwater near the 799 Deer

21    Facility. However, even if CalPeco were not independently aware, (1) on or about May 24, 2024,

22    EcoRights sent the May 2024 Notice Letter to CalPeco, detailing RCRA and CWA violations

23    related to CalPeco's release or discharge of the Listed Chemicals from the 799 Deer Facility to

24    Griff Creek, groundwater, and Lake Tahoe; (2) EcoRights provided CalPeco with the June 2024

25    Notice Letter on or about June 10, 2024, which further discussed the discharges or releases of

26    Listed Chemicals from the 799 Deer Facility to sources of drinking water; and (3) based on the

27    799 Deer Facility's location, it is common knowledge that storm water and/or snow melt from the

28    799 Deer Facility would generally flow into Griff Creek, groundwater and/or Lake Tahoe.

153.    A "source of drinking water" means either a present source of drinking water or water that is identified or designated in a water quality control plan adopted by a California Regional Water Quality Control Board as being suitable for domestic or municipal uses. California Health & Safety Code § 25249.11(d). Moreover, "water" is defined to include both surface and groundwater. 27 California Code of Regulations § 25102(w). Thus, for Proposition 65 purposes, waters of all types that are considered "suitable" for "domestic" or "municipal" use in these regional water quality control plans are "sources of drinking water" within the meaning of Proposition 65. *See People ex rel. Lungren v. Superior Court*, 926 P.2d 1042, 1046-47 (Cal. 1996). One of the predominant purposes of Proposition 65, as stated in the preamble, ballot summary, and arguments, was to protect drinking water from toxic contamination. Considering that purpose, the term "source of drinking water" was expansively defined to include *any* water currently destined to be used as drinking water, as well as any water officially designated as suitable for drinking water. *People ex rel. Lungren*, 14 Cal. 4th at 307.

154.    In its Basin Plan, the Regional Board has determined that beneficial uses for Lake Tahoe include municipal water supply including but not limited to drinking water supply. *See* Basin Plan at 2-17. The Regional Board also determined that beneficial uses for Pope Marsh/Wetlands include municipal water supply including but not limited to drinking water supply. *Id.* Further, in the Basin Plan, the Regional Board listed municipal supply including but not limited to drinking water supply as an existing beneficial use for all groundwater in the region, including Tahoe Valley South and Tahoe Valley North. *Id.* at 2-48 (Table 2-2). As a result, Lake Tahoe and its tributaries including Griff Creek, Pope Marsh/Wetland, and any affected groundwater in the area are a "source of drinking water" for Proposition 65 purposes, regardless of whether anyone is presently drawing water from these sources for use as drinking water.

155.    Where, as here, the requirements of California Health & Safety Code § 25249.5 are met, an entity can only avoid Proposition 65 liability if it meets the requirement of California Health & Safety Code § 25249.9. First, it can avoid liability if the relevant chemicals known to the state to cause cancer or reproductive toxicity were listed less than 20 months prior to the

alleged violations. California Health & Safety Code § 25249.9(a). Second, if the chemicals were listed over 20 months prior to the violations, the entity can *only* avoid liability if it meets *both* of the following requirements: (1) "The discharge or release will not cause any significant amount of the discharged or released chemical to enter any source of drinking water" *and* (2) "The discharge or release is in conformity with all other laws and with every applicable regulation, permit, requirement, and order." California Health & Safety Code § 25249.9(b). CalPeco cannot meet either of these alternative bases for avoiding Proposition 65 liability. *See* California Health & Safety Code § 25249.9 (it is the defendant's burden to prove any of these grounds for avoiding liability exist).

156.    First, all of the Listed Chemicals were added to the State List between January 1, 1988 and October 21, 2016. *See* https://oehha.ca.gov/proposition-65/proposition-65-list (pentachlorophenol (listed January 1, 1990); pentachlorophenol and by-products of its synthesis (complex mixture) (listed October 21, 2016); polychlorinated dibenzo-p-dioxins (listed October 1, 1992); polychlorinated dibenzofurans (listed October 1, 1992); 2,3,7,8-Tetrachlorodibenzo-p-dioxin (TCDD) (listed January 1, 1988 (cancer) and April 1, 1991 (developmental toxicity)); hexachlorodibenzodioxin (listed April 1, 1988)). EcoRights has limited its claims here to violations occurring from June 10, 2019 to the present. Therefore, at a minimum, all violations occurred a minimum of 31 months after the most recent Listed Chemical was added to the State List (pentachlorophenol and by-products of its synthesis (complex mixture)) and as much as over 31 years after the other Listed Chemicals were added to the State List.

157.    Second, CalPeco cannot show that its "discharge or release [of the Listed Chemicals] will not cause any significant amount of the discharged or released chemical to enter any source of drinking water." California Health & Safety Code § 25249.9(b)(1). For example, EcoRights' sampling results have shown concentrations of these pollutants in soil at the Facilities' grounds and immediately outside of those grounds that exceed ESLs. These numbers are significant and result in a "significant amount" of the Listed Chemicals going to the identified "source[s] of drinking water."

158.    Third, even if CalPeco somehow could prove that it met the above criterion, which

1    it cannot, it would fail to prove the second requirement of California Health & Safety Code §

2    25249.9(b), namely that "[t]he discharge or release is in conformity with all other laws and with

3    every applicable regulation, permit, requirement, and order." California Health & Safety Code §

4    25249.9(b)(2).

5          159.    EcoRights has provided extensive support above for its claims that CalPeco's

6    discharge or release of the Listed Chemicals from the Facilities to Lake Tahoe and groundwater is

7    in violation of RCRA and the CWA.

8          160.    CalPeco's discharge or release of the Listed Chemicals from the Facilities to Lake

9    Tahoe and groundwater is also in violation of California state laws, regulations, permits,

10   requirements, and/or orders regarding the handling, storage, treatment, transportation, disposal,

11   labeling, recycling, reuse, generation, accumulation, maintenance, receipt, handling,

12   recordkeeping, reporting, resizing, sorting, segregating, training, and/or other actions relating to

13   hazardous and/or solid waste. This includes, but is not limited to, violations of the Hazardous

14   Waste Control Act and the regulations implementing the same. *See, e.g.,* California Health &

15   Safety Code, Division 20, Chapter 6.5; 22 California Code of Regulations Division 4.5.

16   **V.    Use and Enjoyment of the Affected Areas by EcoRights and Its Members.**

17         161.    Certain of EcoRights' members, employees, and volunteers live, visit, and/or

18   recreate in and around the areas described in the above paragraphs that are adversely impacted by

19   polluted storm water discharges from the Facilities and contaminated soils and sediments tracked

20   from the Facilities and carried by storm water runoff and/or snow melt into storm drains and other

21   conveyances off-site that flow into various waterways. Certain of EcoRights' members,

22   employees, and volunteers are also adversely impacted by CalPeco's discharges or releases of the

23   Listed Chemicals to Lake Tahoe, its tributaries and surrounding waters, and to groundwater,

24   which are sources of drinking water under Proposition 65.

25         162.    EcoRights' members, employees, and volunteers have drank and/or presently rely

26   on drinking water in Kings Beach, California, Tahoe Vista, California, and/or South Lake Tahoe

27   California for their domestic and other needs and plan to continue to do so in the future.

28   EcoRights' members, employees, and volunteers are concerned about CalPeco's discharge or

release of the Listed Chemicals to sources of drinking water in and around the Facilities. The presence of the Listed Chemicals in the surrounding sources of drinking water is concerning from a water security standpoint and also as a health threat to EcoRights' members, employees, and volunteers; their families; their friends; other members of their community that they care about; their pets; and wildlife. Knowing about the pollution caused by CalPeco's release or discharge of the Listed Chemicals to sources of drinking water makes EcoRights' members, employees, and volunteers concerned and reduces EcoRights' members, employees, and volunteers use and enjoyment of their property, of these sources of drinking water, of their time spent in and around Lake Tahoe, of the activities they engage in in and around Lake Tahoe, and of the individuals and wildlife they observe when they are in Kings Beach, Tahoe Vista, and/or South Lake Tahoe, California.

163.    The Wood Treatment Mixtures Waste discharged by CalPeco from the Facilities, and present in the soils and sediments tracked off of the Facilities, including Dioxins, are highly toxic and bio-accumulate and bio-magnify in the ecosystem of aquatic life and wildlife described above that EcoRights' members, employees, and volunteers enjoy in and around Lake Tahoe, rendering the aquatic life and wildlife contaminated with these pollutants. This reduces EcoRights' members', employees', and volunteers' use and enjoyment of the surrounding waters, lands, and activities.

164.    EcoRights' members, employees, and volunteers travel to the areas and waters adversely affected by polluted storm water discharges from, and contaminated soils and sediments tracked off of, the Facilities, including, but not limited to, Lake Tahoe and its tributaries including Griff Creek; Tahoe Keys; Pope Marsh; and the valuable riparian, wetland, and other areas within and adjacent to those waters and lands, harmed and/or threatened with harm by CalPeco's pollution, to watch wildlife such as birds, fish, wildlife, and amphibians. EcoRights' members, employees, and volunteers have concrete plans to travel to these areas in the future to watch these birds, fish, wildlife, and amphibians.

165.    The Wood Treatment Mixtures Waste discharged by CalPeco from the Facilities, and present in the soils and sediments tracked off of the Facilities, including Dioxins, are highly

1    toxic to the reproductive health and viability of the wildlife that EcoRights' members, employees,

2    and volunteers enjoy during their visits to these locations. This reduces EcoRights' members',

3    employees', and volunteers' use and enjoyment of these waters, lands, and activities.

4        166.    EcoRights' members, employees, and volunteers have used, use, and will in the

5    future use the waters and lands near Lake Tahoe and its tributaries, which are adversely affected

6    by polluted storm water discharges from, and contaminated soils and sediments tracked off of the

7    Facilities, for numerous recreational purposes. EcoRights' members, employees, and volunteers

8    have concrete plans to continue to make use of these areas in the future. EcoRights' members,

9    employees, and volunteers kayak, paddle board, boat, swim, wade, enjoy spending time at the

10    shoreline, bicycle, hike, jog, and drive by Lake Tahoe and its tributaries including Griff Creek,

11    Tahoe Keys, Pope Marsh, and the valuable riparian, wetland, and other areas within and adjacent

12    to those waters and lands, and have concrete plans to continue to do so in the future. The

13    contamination from the Facilities reduces EcoRights' members', employees', and volunteers' use

14    and enjoyment of these waters, lands, and activities.

15        167.    EcoRights' members, employees, and volunteers have an economic stake in the

16    environmental quality of the areas and waters adversely affected by polluted storm water and/or

17    snow melt discharges from, and contaminated soils and sediments tracked off of, the Facilities.

18    For example, EcoRights' members, employees, and volunteers own or rent real property in close

19    proximity to the affected waters and lands in and near Kings Beach, California. EcoRights'

20    members, employees, and volunteers spend money on gas in order to be in close proximity to the

21    affected waters and lands. EcoRights' members, employees, and volunteers attach monetary value

22    to their health and to their appreciation of the natural environment. They have spent money on

23    both. EcoRights' members, employees, and volunteers have spent money to travel to places

24    where they are able to view wildlife, recreate, and obtain a general aesthetic and spiritual sense of

25    a healthy, clean, and natural environment. Human health and aesthetic and spiritual enjoyment of

26    the natural environment have a real monetary value for EcoRights' members, employees, and

27    volunteers. EcoRights' members, employees, and volunteers have spent money to rent, buy, and

28    maintain equipment, such as kayaks and paddle boards, that they take out on waters adversely

affected by polluted storm water and/or snow melt discharges from, and contaminated soils and sediments tracked from, the Facilities.

168.    EcoRights' members, employees, and volunteers come into contact with the water and suspended sediment when they engage in activities, including, but not limited to, kayaking, wading, walking, paddle boarding, hiking, and boating within the areas adversely affected by polluted storm water and/or snow melt discharges from, and contaminated soils and sediments tracked off of, the Facilities. The contamination of these areas reduces EcoRights' members', employees', and volunteers' use and enjoyment of these waters, lands, and activities and causes them to be concerned about their health from the effects of this contamination.

**VI.    How CalPeco's Toxic Discharges or Releases Cause Harm to the Interests of EcoRights and Its Members, Employees, and Volunteers.**

169.    The environment that EcoRights' members, employees, and volunteers enjoy in the areas downstream of the Facilities is harmed by CalPeco's discharges or releases of pollutants, including, but not limited to, the affected sources of drinking water. EcoRights' members, employees, and volunteers are also concerned that their health and/or the health of surrounding wildlife is endangered by these discharges or releases. CalPeco's discharges or releases of pollutants, including, but not limited to, the Listed Chemicals, and/or handling, storage, treatment, transportation, and/or disposal of solid and/or hazardous waste at and from the Facilities are a public and private nuisance within the meaning of Cal. Civ. Code § 3470 in that these discharges are "injurious to health, are indecent or offensive to the senses, and interfere with the comfortable enjoyment of life and property." By discharging or releasing contaminated storm water and/or snow melt and other material contaminated with the Listed Chemicals and other chemicals and handling, storing, treating, transporting, and/or disposing of toxic solid and/or hazardous waste at and from its Facilities in an improper and illegal manner, CalPeco has externalized a cost of its business and forced that cost onto the people who live in and around and/or use the affected areas, including EcoRights' members, employees, and volunteers.

170.    EcoRights' members, employees, and volunteers are reasonably concerned and upset that the discharges and releases of toxic pollutants from the Facilities contribute to the

56

degradation of the downstream aquatic and other environments, including, but not limited to sources of drinking water, in the affected areas and inhibits their recovery. CalPeco's discharge and release of pollutants at and from the Facilities threatens and impairs the viability of fish, birds, and other aquatic and terrestrial species of all trophic levels, including humans. CalPeco's discharges and releases of pollutants to the affected waters, and contamination of soils and sediments of the affected areas, threatens the viability, contributes to the impairment, and inhibits the recovery of these valuable natural resources. These reasonable concerns and frustrations diminish EcoRights' members' use and enjoyment of the area's natural resources.

171.    When EcoRights' members, employees, and volunteers experience the affected areas as they, for example, regularly drive, walk, jog, observe wildlife, hike, and/or bicycle along those water bodies and/or kayak, wade, boat, and/or paddle board in these water bodies – now and concretely in the future – their knowledge that the areas are polluted by CalPeco's discharges or releases upsets and disturbs them, causes them emotional pain, and thus diminishes the aesthetic, recreational, emotional, and spiritual enjoyment they would otherwise obtain from viewing and contemplating the affected waters and wildlife and engaging in activities in and/or near those affected waters. This is one way that CalPeco's pollution harms EcoRights' members, employees, and volunteers: it reduces their use and enjoyment of these resources and causes them emotional distress. When EcoRights' members, employees, and volunteers observe wildlife in, or birds in flight above, the areas impacted by CalPeco's discharges or releases and handling, storage, treatment, transportation, and/or disposal of solid and/or hazardous waste at the Facilities in a manner that may present an imminent and substantial endangerment to health and the environment, their recreational and spiritual enjoyment is diminished by knowing the areas are polluted by CalPeco's discharges or releases and that local wildlife is being harmed by this pollution. EcoRights' members', employees', and volunteers' enjoyment value is diminished relative to the cost of living (or visiting) the impacted areas. In this way, pollution of the impacted areas cheats EcoRights' members, employees, and volunteers out of some of the value they would otherwise obtain from the money they spend on their mortgages, rent, automobiles, utility (including water) bills, and other actions needed to use and visit these areas. Pollution of the

impacted areas interferes with the quiet enjoyment that EcoRights' members, employees, and volunteers would otherwise obtain, both real and personal.

172.    Because EcoRights' members, employees, and volunteers come into contact with the water and soils and sediments in the affected waters, pollution from the Facilities increases the risk that their skin will come directly into contact with Dioxins and other pollutants and/or that they will accidentally, or intentionally, swallow contaminated water, and that they will track Dioxins into the members' homes or automobiles, exposing the members and their families to these extremely toxic chemicals. This increases the risk that EcoRights' members, employees, and volunteers will ingest or absorb Dioxins that have been discharged from the Facilities. As a result of CalPeco's illegal discharges or releases of contaminated storm water and/or snow melt and other contaminated materials at and from the Facilities, EcoRights' members, employees, and volunteers – when working for EcoRights or when recreating on, in, or around the affected waters – face increased risk of suffering toxic endpoints caused by exposure to Dioxins and other pollutants, as described above.

173.    The waters contaminated by CalPeco's discharge of the Wood Treatment Mixtures Waste from the Facilities are sources of drinking water for Proposition 65 purposes. EcoRights' members, employees, and volunteers drink water in Kings Beach, Tahoe Vista, and/or South Lake Tahoe, California, that is polluted in part by CalPeco's discharges from the Facilities. The bio-accumulation and bio-magnification processes described above help carry the persistent toxic substances in the Wood Treatment Mixtures Waste, such as Dioxins, up the food chain. Some of EcoRights' members, employees, and volunteers thereby bear a cost that CalPeco has externalized and imposed on them through their illegal discharge of pollutants and disposal of toxic solid or hazardous waste into the affected environments.

**VII.    How this Action Redresses the Harm CalPeco Causes to EcoRights and Its members, Employees, and Volunteers.**

174.    CalPeco's unpermitted discharges or releases of pollutants to the affected areas makes the areas less beautiful, less healthy, less safe, less secure, less enjoyable, less emotionally and spiritually fulfilling, and less economically valuable than would be the case if CalPeco

58

complied with RCRA, the CWA, and/or Proposition 65 at the Facilities. This is a cost that CalPeco has externalized onto the people who live in, visit, and/or use the affected areas, including EcoRights' members, employees, and volunteers who live in, visit, and/or use those areas. This has harmed EcoRights' members', employees', and volunteers' use and enjoyment of the affected areas, their real and personal property, their economic interests, their personal senses of emotional and spiritual well-being, and their personal senses of human dignity. Were CalPeco required to comply with RCRA, the CWA, and/or Proposition 65 – the principal objective of EcoRights' citizen suit – then these externalities would gradually be reduced or eliminated. If EcoRights is successful in this action, CalPeco will be required to halt or reduce the harm from its handling, storage, treatment, transportation, and/or disposal of any solid and/or hazardous waste from the Facilities which may present an imminent and substantial endangerment to health or the environment, to bring its discharges from the Facilities to waters of the United States into compliance with the CWA and thus reduce its discharges of pollutants to the affected receiving waters and areas, and/or to reduce or halt its discharge or release of the Listed Chemicals to sources of drinking water. This would benefit EcoRights and EcoRights' members, employees, and volunteers in reducing the harms and the externalities, discussed above, that they currently suffer as a result of CalPeco's discharge or release of pollutants from the Facilities.

**VIII.  EcoRights Has Organizational Standing to Bring This Lawsuit.**

175.    As explained above, (1) EcoRights members, volunteers, and/or employees are experiencing injuries in fact to their interests that are concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) these injuries are fairly traceable to the actions or inactions of CalPeco that are the source of the RCRA, CWA, and Proposition 65 claims in the Complaint; and (3) it is likely that these injuries would be at least partially redressed by a favorable decision. As a result, EcoRights' members would have standing to sue CalPeco on their own behalf. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

176.    As explained above, EcoRights is a non-profit public benefit corporation that focuses on protecting surface waters and groundwater from pollution and degradation. EcoRights

represents citizens who are striving to protect soil and waterways from pollution and secure the multitude of public and private benefits that follow from clean soil and from pure water: reduced incidences of cancer and birth defects; safe drinking water; abundant and diverse wildlife populations; healthy recreational opportunities; food uncontaminated by toxic chemicals; economic prosperity from commercial, sport, and subsistence fishing; and other recreational, spiritual, and commercial activities that depend on clean soil and pure water. In particular EcoRights has worked for decades to prevent Dioxins pollution. Thus, prevention of Dioxins, and other, pollution, including Dioxins, and other, pollution originating from the Facilities, and the harm to human health and the environment resulting from such pollution, is plainly germane to EcoRights' organizational purpose. *See Laidlaw*, 528 U.S. at 181.

177.    Finally, "neither the claim[s] asserted nor the relief requested necessitates the participation of individual members in the lawsuit." *Id.*

178.    Thus, EcoRights has organizational standing to bring this lawsuit. *Id.* at 180-81.

# CLAIMS

## FIRST CLAIM FOR RELIEF

### Violations of RCRA

179.    EcoRights repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint as if fully set forth herein.

180.    Through its ownership and operation of the three Facilities, CalPeco is a past and present generator of solid or hazardous waste. CalPeco has contributed and is contributing to the past and present handling, storage, treatment, transportation and disposal of solid or hazardous waste at the Facilities in a manner that may present an imminent and substantial endangerment to health and the environment.

181.    An action for relief against CalPeco for the imminent and substantial endangerment described in this Complaint is authorized by RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B). CalPeco's acts and omissions that may be posing an imminent and substantial endangerment within the meaning of RCRA section 702(a)(1)(B), as alleged above, are continuing. Continuing commission of the acts and omissions alleged above will irreparably

harm EcoRights and EcoRights' members, employees, and volunteers for which harm they have no plain, speedy, or adequate remedy at law.

<strong>SECOND CLAIM FOR RELIEF</strong>

<strong>Violations of the CWA</strong>

182.    EcoRights repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint as if fully set forth herein.

183.    CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless authorized by the terms of an NPDES permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

184.    CalPeco does not have NPDES permit authorization for storm water and/or snow melt discharges from the Facilities into waters of the United States.

185.    Since May 24, 2019, CalPeco has been discharging polluted storm water and/or snow melt from the Facilities without NPDES permit authorization during every significant rain event (*i.e.*, all rainfall events generating 0.1 inches or more of rain) in violation of CWA section 301(a), 33 U.S.C. § 1311(a).

186.    CalPeco will continue to be in violation of CWA section 301(a)'s discharge prohibition each day it discharges storm water and/or snow melt from the Facilities without obtaining an NPDES permit.

187.    Each day that CalPeco has discharged pollutants in storm water without an NPDES permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

188.    If CalPeco were to file NOIs for the Facilities, it would not be in compliance with the General Permit due to its excessive discharges of pollutants and other CWA violations.

189.    CalPeco has failed to develop and implement adequate SWPPPs for the Facilities that meet the requirements of the General Permit. *See* General Permit § X.

190.    CalPeco has failed to develop and implement adequate MIPs for the Facilities that meet the requirements of the General Permit. *See* General Permit §§ X.I, XI.

191.    By committing the acts and omissions alleged above, CalPeco is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d), 1365.

192.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm EcoRights and EcoRights' members, employees, and volunteers for which harm they have no plain, speedy, or adequate remedy at law.

**THIRD CLAIM FOR RELIEF**

**Violations of Proposition 65**

193.    EcoRights repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint as if fully set forth herein.

194.    CalPeco, through its ownership and operation of the Facilities has, and continues to, knowingly in the course of doing business discharge or release one or more chemicals known to the state of California to cause cancer or reproductive toxicity into water or onto or into land where such chemical(s) passes or probably will pass into any source of drinking water.

195.    An action for injunctive relief for CalPeco's violations of Proposition 65 is authorized by California Health & Safety Code § 25249.7(a). Continuing commission of the acts and omissions alleged above will irreparably harm EcoRights and EcoRights' members, employees, and volunteers for which harm they have no plain, speedy, or adequate remedy at law.

196.    An action for civil penalties for CalPeco's violations of Proposition 65 is authorized by California Health & Safety Code § 25249.7(b).

**<u>REMEDY</u>**

197.    EcoRights has no plain, speedy, and adequate remedy, in the ordinary course of law, other than the relief sought in this Complaint, because there is no other mechanism for compelling Calpeco to take the actions necessary under RCRA, the CWA, and Proposition 65 to abate its unlawful handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the

62

environment and unlawful discharges and releases of pollutants, including, but not limited to, the

Listed Chemicals, to waters of the United States and sources of drinking water.

### **PRAYER FOR RELIEF**

198.    WHEREFORE, EcoRights respectfully requests that this Court grant the following

relief:

a.    Declare that CalPeco has violated and is in continued violation of RCRA, the

CWA, and Proposition 65 as alleged herein;

b.    Enjoin CalPeco from handling, storage, treatment, transportation, or disposal of

any solid or hazardous waste which may present an imminent and substantial endangerment to

health or the environment;

c.    Enjoin CalPeco from discharging pollutants from the Facilities to waters of the

United States;

d.    Enjoin CalPeco to apply for and secure NPDES permit authorization under the

General Permit or individual NPDES permits for the Facilities;

e.    Enjoin CalPeco from discharging or releasing the Listed Chemicals into water or

onto or into land where such chemical passes or probably will pass into any source of drinking

water;

f.    Enjoin CalPeco from violating the substantive and procedural requirements of

RCRA, the CWA, Proposition 65, the General Permit, and/or an individual NPDES permit, as

applicable;

g.    Enjoin CalPeco to characterize and remediate contamination that has migrated

offsite and that remains onsite at the Facilities, including, but not limited to contamination of soil,

sediment, or water, including, but not limited to, sources of drinking water and waters of the

United States;

h.    Order CalPeco to pay civil penalties of $68,445 per day per violation for all CWA

violations pursuant to section 309(d) of the Clean Water Act, 33 U.S.C. §1319(d), and the

Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

1    i.    Order CalPeco to pay civil penalties of $2,500 per day per violation for all

2    Proposition 65 violations pursuant to California Health & Safety Code § 25249.7(b);

3    j.    Award EcoRights its reasonable costs of suit, including attorney, witness, expert,

4    and consultant fees, in accord with RCRA section 7002(f), 42 U.S.C. § 6972(f); CWA section

5    505(d), 33 U.S.C. § 1365(d); and California Code of Civil Procedure § 1021.5; and

6    k.    Award such other relief as this Court may deem appropriate.

7

8    Dated: July 23, 2025                        Respectfully submitted,

9                                                /s/ Marla Fox
                                                Marla Fox
10                                               Counsel for Ecological Rights Foundation

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28